173 F.Supp.2d 987 (2001)
UNITED STATES ex rel. Carmen T. ROSALES and Michael V. Meadows, Plaintiffs,
v.
SAN FRANCISCO HOUSING AUTHORITY, et al., Defendants.
No. C-95-4509 CAL.
United States District Court, N.D. California.
March 26, 2001.
*988 *989 Joann M. Swanson, Office of the U.S. Attorney, San Francisco, CA, Michael F. Hertz, U.S. Department of Justice Commercial Litigation Branch, Washington, DC, Tyree P. Jones Jr., Interactive Law Group, San Francisco, CA, for Plaintiffs.
Donald P. Margolis, Office of City Attorney, San Francisco, CA, for Defendants.

ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
LEGGE, District Judge.

 TABLE OF CONTENTS
INTRODUCTION ...................................................................990

*990
 I. THE COMPLAINT .............................................................991
 II. SUMMARY JUDGMENT STANDARD .................................................991
III. FALSE CLAIMS ..............................................................992
 A. Jurisdictional Requirements ............................................992
 B. HOPE VI and COMP Grants ................................................993
 1. Public Disclosure ...................................................994
 2. Original Source .....................................................997
 C. YAP and ADPCT Grants ...................................................999
 D. Section 8 Certificates .................................................999
 1. Public Disclosure and Original Source ..............................1000
 2. Sales of Housing Opportunities as False Claims .....................1001
 3. Scienter ...........................................................1001
 4. Does the FCA Authorize Private Suit Against a Local Governmental
 Entity Such as the SFHA? ..........................................1004
 a. The Vermont Agency Decision ........................................1005
 b. Contentions of the Parties .........................................1006
 c. Application of Vermont Agency to This Case .........................1007
 i. Cases Before Vermont Agency ....................................1007
 ii. Cases Since Vermont Agency .....................................1008
 iii. Analysis .......................................................1009
 (a) The SFHA is not a sovereign ................................1009
 (b) The SFHA is a statutory person .............................1010
 (c) The FCA's Damages Provisions Do Not Preclude the
 SFHA from Being a Statutory Person ........................1012
 5. Damages ............................................................1015
 a. The Text, Structure and Legislative History of the FCA
 Demonstrate that a Complex Combination of Compensation,
 Retribution and Deterrence Was Intended ........................1016
 b. The FCA as Applied to the SFHA Does Not Violate the
 Policies Articulated in Newport ................................1022
IV. RETALIATION FOR WHISTLEBLOWING ............................................1024
CONCLUSION ....................................................................1026

INTRODUCTION
This matter comes before the Court on the motion for summary judgment or partial summary judgment of defendants the San Francisco Housing Authority ("SFHA"), the City and County of San Francisco ("San Francisco" or "the city"), and individual defendants Albert Nelson and David I. Gilmore (collectively "defendants").[1]
Although this case was filed in 1995, it did not progress significantly between 1995 and 1997, when the United States finally decided not to intervene. Discovery commenced in early 1998. An amended complaint was filed in 1999, and the case was set for trial in late 1999. But extensive criminal proceedings were initiated in November of 1999 and have only recently been concluded.
*991 The court previously dismissed with prejudice the claims against the State of California. Defendants make the present motion for summary judgment or partial summary judgment on the first and third claims for relief of qui tam relators/plaintiffs Carmen T. Rosales and Michael V. Meadows ("plaintiffs"). The court heard oral argument of the motion, but later stayed all proceedings pending the U.S. Supreme Court's decision in Vermont Agency of Natural Resources v. United States ex rel. Stevens, 529 U.S. 765, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000). After Vermont Agency was decided on May 22, 2000, the parties submitted supplemental briefing on the applicability of that decision to the present case. The court then heard further argument. Having considered the oral arguments and written submissions of counsel, the evidence of record, and the applicable law, the court now issues the following order.

I.

THE COMPLAINT
Plaintiffs Carmen T. Rosales and Michael V. Meadows filed this action alleging, among other things, violations of the federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, by their employer the SFHA, the City and County of San Francisco, and individual employees of the SFHA. In their fourth amended complaint ("complaint") plaintiffs allege that defendants made false and fraudulent statements to the Department of Housing and Urban Development ("HUD") in order to receive grant funds for which the SFHA was not qualified. Plaintiffs also contend that defendants issued so-called "Section 8" subsidized housing certificates to ineligible individuals, and that SFHA employees charged personal fees for this service. Finally, plaintiffs claim that their supervisors retaliated against them for complaining about these improprieties and for making the allegations public.
Plaintiffs' complaint states three claims for relief. First, plaintiffs allege that all of the defendants participated in submitting false claims for payment to the United States government in violation of the FCA, 31 U.S.C. § 3729. Second, plaintiffs allege that defendants Nelson, Davis and the SFHA retaliated against them for complaining about the SFHA's failure to comply with HUD regulations and guidelines. This retaliation allegedly consisted of derogatory remarks and epithets, unwarranted reprimands, exclusion from meetings, and office reorganizations eliminating plaintiffs' employment positions. Plaintiffs claim that this retaliatory conduct was performed in derogation of their rights under the First and Fourteenth Amendments in violation of 42 U.S.C. § 1983. Third, plaintiffs also claim that this retaliatory conduct by Nelson, Davis and the SFHA violated the FCA's anti-retaliation provision, 31 U.S.C. § 3730(h). Plaintiffs seek, inter alia, treble and punitive damages.
Defendants' present motion for summary judgment or partial summary judgment concerns only the first and third claims for relief.

II.

SUMMARY JUDGMENT STANDARD
Summary judgment should be granted if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no `genuine issue for trial.'" Matsushita Elec. Industrial Co. v. Zenith Radio, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing First National Bank of Arizona v. Cities Service Co., *992 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). "At the summary judgment stage, the district court is not to weigh the evidence or determine the truth of the matter but should only decide whether there is a genuine issue for trial." Washington v. Garrett, 10 F.3d 1421, 1428 (9th Cir.1993) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).
The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of `the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting from Fed.R.Civ.P. 56(c)).
When the nonmoving party will bear the burden of proof at trial on a dispositive issue, she must then "go beyond the pleadings and by her own affidavits, or by the `depositions, answers to interrogatories and admissions on file,' designate `specific facts showing that there is a genuine issue for trial.'" Id. at 324, 106 S.Ct. 2548 (quoting from Fed.R. Civ.P. 56(c) & (e)). The court views all facts and draws all inferences therefrom in the light most favorable to the nonmoving party. United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). If, however, the nonmoving party's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. Anderson, 477 U.S. at 249-50, 106 S.Ct. 2505 (citations omitted).

III.

FALSE CLAIMS
Plaintiffs allege that defendants violated the False Claims Act ("FCA") by submitting false claims for payment to the federal government. The allegations concern various grant and subsidy programs administered by HUD.
To establish a violation of the FCA, plaintiffs must prove three elements: (1) a "false or fraudulent" claim; (2) which was presented, or caused to be presented, by defendants to the United States for payment or approval; (3) with knowledge that the claim was false. See United States v. Mackby, 243 F.3d 1159 (9th Cir.2001) (citing 31 U.S.C. § 3729(a)(1)).
Defendants argue that plaintiffs' first claim for relief for violation of the FCA is barred by the FCA's jurisdictional requirements. They further maintain that plaintiffs present no evidence that defendants' allegedly false submissions to HUD wrongly qualified the SFHA for federal grant money, or that San Francisco and the SFHA had the requisite scienter. Finally, defendants contend that the FCA does not allow suit against San Francisco or the SFHA under Vermont Agency of Natural Resources v. United States ex rel. Stevens, 529 U.S. 765, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000).

A. Jurisdictional Requirements
Rosales and Meadows, as the qui tam plaintiffs, bear the burden of establishing subject matter jurisdiction by a preponderance of the evidence. See United States v. Alcan Electrical and Engineering, Inc., 197 F.3d 1014, 1018 (9th Cir.1999) (citing United States ex rel. Biddle v. Board of Trustees of the Leland Stanford, Jr. University, 161 F.3d 533, 540 (9th Cir.1998), cert. denied, 526 U.S. 1066, 119 S.Ct. 1457, 143 L.Ed.2d 543 (1999)).
Section 3730(e)(4) of the FCA requires, in pertinent part:
(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or *993 administrative hearing, in a congressional, administrative, or government Accounting Office report, hearing, audit, or investigation, or from the news media, unless ... the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the government before filing an action under this section which is based on the information.
31 U.S.C. § 3730(e)(4) (emphases added).
The United States Supreme Court, construing § 3730(e)(4), has stated that the FCA authorizes "qui tam suits based on information in the government's possession, except where the suit was based on information that had been publicly disclosed and was not brought by an original source of the information." Hughes Aircraft Co. v. United States ex rel. Schumer, 520 U.S. 939, 946, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997). To qualify as an "original source," a qui tam plaintiff must show that he or she: (1) has direct and independent knowledge of the information on which the allegations are based; (2) voluntarily provided the information to the government before filing the qui tam action; and (3) had a hand in the public disclosure of allegations that are a part of the suit. See United States ex rel. Devlin v. California, 84 F.3d 358, 360 fn. 3 (9th Cir.1996), cert. denied, 519 U.S. 949, 117 S.Ct. 361, 136 L.Ed.2d 252 (1996).
Accordingly, this court must examine each alleged false claim to determine whether the allegation or transaction had been publicly disclosed before filing of the suit, and if so whether plaintiffs were the original source of the information. If the jurisdictional hurdle is cleared as to each alleged false claim, the court will then address the further arguments raised by the parties. See Vermont Agency of Natural Resources v. United States ex rel. Stevens, 529 U.S. 765, 120 S.Ct. 1858, 1865, 146 L.Ed.2d 836 (2000) ("Questions of jurisdiction, of course, should be given priority - since if there is no jurisdiction there is no authority to sit in judgment of anything else."); Wang v. FMC Corp., 975 F.2d 1412, 1415 (9th Cir.1992) ("We must examine whether any of Wang's claims are blocked by the jurisdictional bar of section 3730(e)(4) before we can consider any other question.") (emphasis in original).

B. HOPE VI and COMP Grants
Plaintiffs allege that defendants knowingly made false claims for moneys to the United States by applying for and receiving HOPE VI and Comprehensive ("COMP") grants from HUD based on inaccurate assessments of management performance under the Public Housing Management Assessment Program ("PHMAP"). Based on these falsified figures, HUD allegedly awarded the SFHA $49,992,377 in HOPE VI grant funds in 1994 and more than $58,173,963 in COMP grant funds for 1992-1995.
The PHMAP is a system designed to allow HUD, in concert with local public housing authorities, to improve management of public housing programs by evaluating the authorities' performance according to a number of key indicators. See 42 U.S.C. § 1437d(j). The indicators include vacancy rates, modernization, rents uncollected, operating reserves, routine operating expenses, and annual inspection of units and systems. See 24 C.F.R. §§ 901.10-901.45. Public housing authorities assign themselves a "score" on each indicator and certify the accuracy of the data. See 24 C.F.R. §§ 901.105, 901.100(a)-(b).
*994 Plaintiffs contend that from 1992 to 1995 the SFHA manipulated its PHMAP scores by knowingly misstating its operating reserves and occupancy/vacancy figures. The SFHA allegedly did so in order to appear to be in compliance with HUD regulations and gain removal from HUD's "troubled" housing authority list, which the SFHA was on from 1989 to 1992.

1. Public Disclosure
Citing two documents - a 1992 HUD Inspector General audit of the SFHA dated September 10, 1992 and a newspaper article dated September 8, 1992 - defendants argue that plaintiffs' allegations were publicly disclosed before the filing of the present lawsuit on December 15, 1995.
The HUD audit report, entitled "The SFHA's Questionable Fiscal Year 1991 PHMAP Certification Led to HUD's Premature Removal of the Authority's `Troubled' Designation," certainly draws attention to irregularities in the SFHA's PHMAP self-assessment and certification. See Def. Req. for Jud. Not., Exh. A ("HUD audit"). It states: "Based on our review, we believe that the SFHA's PHMAP certification and PHMAP self-assessment were of questionable accuracy. Indications are that the SFHA scored itself higher than warranted and certified to questionable PHMAP performance data which prompted HUD to remove the Authority's `troubled' agency designation prematurely." Id. at H00468. The HUD audit concluded, inter alia, that the SFHA had understated the actual number and percentage of vacancies by leasing vacant units and counting them as occupied even though they were not occupied. See id. at H00474. It also found that the SFHA had not overstated its operating reserves although there appeared to be some discrepancies in the reported figures. See id. at H00487-00488.
The Employment and Housing Subcommittee on government Operations of the U.S. House of Representatives held a public hearing concerning the HUD audit on September 14, 1992. See Def. Req. for Jud. Not., Exh. D ("subcommittee hearing"). U.S. Representative Tom Lantos, chairman of the subcommittee, repeated many of the findings of the HUD audit. See, e.g., id. at 3 ("The IG found that the San Francisco Housing Authority was counting vacant units as occupied as of the dates they were leased to a new tenant, even though the units were empty and not yet habitable.")
Defendants also cite an article published in the San Francisco Independent on September 8, 1992, two days before release of the official HUD audit, entitled "Feds Slam Housing Authority." See Def. Req. for Jud. Not., Exh. E ("Independent article"). The Independent article recapitulated many of the findings in the HUD audit. For example, the article reported that, according to a draft report of the HUD audit, "the Housing Authority provided HUD with an erroneous self-assessment in order to convince the federal office to remove the housing agency from the `troubled list.'" Id. at H02148. It also stated: "As part of that self-assessment, the Authority did not report all of its vacancies to HUD and knowingly submitted false information." Id. The Independent article further reported that "[n]o acceptable documentation could be provided for the $7.8 million operating reserves reported by the Housing Authority." Id. at H02149.
Audits performed and released to the public by inspectors general qualify as public disclosures under 31 U.S.C. § 3730(e)(4)(a). See United States ex rel. Fine v. Chevron, Inc., 72 F.3d 740, 743 (9th Cir.1995) (en banc), cert. denied, 517 U.S. 1233, 116 S.Ct. 1877, 135 L.Ed.2d 173 (1996). Prior media coverage of allegations *995 can also raise the jurisdictional bar. See, e.g., United States ex rel. Aflatooni v. Kitsap Physicians Services, 163 F.3d 516, 521 (9th Cir.1998) (citing United States ex rel. Biddle v. Board of Trustees of the Leland Stanford, Jr. University, [161] F.3d [533, 540] (9th Cir.1998)).[2] "Where the information underlying the relator's complaint has already been publicly disclosed, the government receives no additional benefit from the relator's filing of a qui tam suit." Aflatooni, 163 F.3d at 522.
Faced with the prior public information cited by defendants, plaintiffs make two arguments. First, citing Biddle, [161] F.3d at [537], they maintain that a qui tam claim is not "based upon" a public disclosure within the meaning of 31 U.S.C. § 3730(e)(4)(a) unless the claim "repeats" information that has already been disclosed to the public. See Opposition at 6:20-25. Plaintiffs assert that their allegations go beyond mere overstatements of operating reserves and occupancy rates. The present lawsuit does not "repeat" the public disclosures, plaintiffs maintain, because the factual allegations underlying the suit are more specific and detailed than the previously disclosed information. See id. at 7:1-8:11.
In support of their position, plaintiffs cite to evidence that SFHA Executive Director David Gilmore "instituted an aggressive leasing strategy to falsely inflate the SFHA's [PHMAP] score by beginning to lease all possible vacant units, whether habitable or occupied, or not." Jones Decl., Exh. D., Rosales Interrog. Resp. No. 2 at 3:11-13. Gilmore allegedly directed SFHA staff to indicate units were leased and occupied when they were not. See Jones Decl., Exh. B, Bains Depo. at 185:16-193:25. Gilmore reportedly asked staff to "pull a dollar from [their] own pocket if necessary to constitute deposits for the units, whether habitable or not, so they could be counted as rented for purposes of SFHA occupancy rates." Jones Decl., Exh. C., Meadows Interrog. Resp. No.1 at 3:3-6.[3] Plaintiffs argue that these and other similar factual allegations do not "repeat" information disclosed in the HUD audit, the subcommittee hearing, or the Independent article and therefore do not trigger the FCA's jurisdictional bar.
Plaintiffs' argument misinterprets the FCA's public disclosure provisions. Biddle does not hold that publicly disclosed information must precisely mirror the allegations stated in the qui tam lawsuit in order for the jurisdictional bar to operate. Plaintiffs quote Biddle for the proposition that "a claim is `based upon' public disclosure when the claim repeats allegations that have already been disclosed to the public." See Opposition at 6:20-25 (citing Biddle, [161] F.3d at [537]). However, the full sentence from Biddle reads: "This language [i.e., the language from Wang v. FMC Corp., 975 F.2d 1412, 1417 (9th Cir. 1992) just cited by the court] supports [one party's] view that a claim is `based upon' public disclosure when the claim repeats allegations that have already been disclosed to the public." Biddle, 161 F.3d at 537 (emphasis added). However, Biddle omitted the "repeats" language that plaintiffs emphasize: "We, therefore, hold that if at the time a relator files a qui tam *996 complaint, the allegations or transactions of the complaint have been publicly disclosed, then the allegations are `based upon' the publicly disclosed information, and the relator must show that he is an original source of the information in order for a district court to have jurisdiction over the lawsuit." Id. at 540. The Ninth Circuit reached this conclusion relying on a passage from Wang that belies plaintiffs' emphasis on the term "repeats":
It is true that Wang's allegation about the Bradley is supported by a few factual assertions never before publicly disclosed; but "fairly characterized" the allegation repeats what the public already knows: that serious problems existed with the Bradley's transmission.
Biddle, 161 F.3d at 537 (quoting from Wang, 975 F.2d at 1417). Thus Biddle does not stand for the proposition that a plaintiff's allegation must precisely repeat a public disclosure for the jurisdictional bar to arise; rather, it is the qui tam allegation, "fairly characterized," that must be considered to determine whether it has already been disclosed to the public.
In Wang the Ninth Circuit clarified that an "allegation" and the "information" on which the allegation is based are distinct concepts:
Courts sometimes speak loosely of barring a qui tam suit because it is based on "publicly disclosed information." ... But the Act bars suits based on publicly disclosed "allegations or transactions," not information. [31] U.S.C. § 3730(e)(4)(A). The point is not mere semantics: the Act distinguishes between "allegations" and the "information on which the allegations are based." [31] U.S.C. § 3730(e)(4)(B). The Act appears to be invoking the common logical distinction between an assertion and its proof. Although not empty, this distinction rarely matters in applying the Act, because where the public knows of information proving an allegation, it necessarily knows of the allegation itself. But the reverse is not always true. An allegation can be made public, even it its proof remains hidden.
Wang, 975 F.2d at 1418 (citations omitted). As the Ninth Circuit has later stated, "allegations divorced from the information upon which they are based can constitute public disclosure." United States v. Alcan Electrical and Engineering, Inc., 197 F.3d 1014, 1020 (9th Cir.1999) (citing Wang, 975 F.2d at 1418).
The gravamen of plaintiffs' present claim, fairly characterized, is that the SFHA through its agents fraudulently manipulated SFHA's PHMAP scores and certified their accuracy in order to gain removal from HUD's "troubled" list and receive HOPE VI and COMP grant funds. This allegation was clearly publicized at least three years before plaintiffs filed the original complaint in this lawsuit. Although all of the purported means by which the SFHA's fraud was perpetrated may not have been commonly known, the prior public disclosures contained enough information to enable the government to pursue an investigation into them. This is enough to trigger the jurisdictional bar. See id. at 1019 (citing United States ex rel. Fine v. Sandia Corp., 70 F.3d 568, 571 (10th Cir.1995)).
Plaintiffs' second argument concerns the timing of the public disclosures. Because the HUD audit, subcommittee testimony, and Independent article concerned transactions in 1992 and before, plaintiffs argue that post-1992 transactions were not publicly disclosed. Separate grant applications were made for each year after 1992, plaintiffs contend, so "[e]ach application constituted a new and separate transaction by which false statements were knowingly made to obtain grant funds." Opposition at 8:13-14.
*997 This argument is also answered by the plain terms of the FCA and applicable Ninth Circuit precedent. Even if each allegedly fraudulent application for grant funding constitutes a "new transaction," the FCA's jurisdictional bar applies not only to publicly disclosed transactions but also to publicly disclosed allegations. See 31 U.S.C. § 3730(e)(4)(A) ("the public disclosure of allegations or transactions") (emphasis added); United States ex rel. Dunleavy v. County of Delaware, 123 F.3d 734, 740 (3d Cir.1997) ("It is clear that the FCA's reference to `allegations or transactions' is in the disjunctive, so that disclosures which reveal either the allegations of fraud or the elements of the underlying fraudulent transaction are sufficient to invoke the jurisdictional bar.").
As discussed above, plaintiffs' allegations, fairly characterized, are that the SFHA defrauded the U.S. government by falsely inflating its PHMAP scores from 1992 to 1995. Although the fraudulent transactions may change with each iteration during the relevant period, the allegation of fraud remains substantially the same. The allegation was first disclosed in 1992; it cannot be reanimated simply by complaining that defendants performed the same fraudulent acts in succeeding years.
This interpretation is supported by the Ninth Circuit's decision in United States ex rel. Lujan v. Hughes Aircraft Co., 162 F.3d 1027 (9th Cir.1998). In Lujan the qui tam relator alleged that her employer submitted fraudulent claims to the U.S. government as a defense subcontractor on the B2 bomber and other projects from 1982 to 1989. Id. at 1029. In an earlier filed case, however, a qui tam relator named Schumer had already alleged fraud in connection with Hughes' cost-sharing transactions, commonality agreements and radar program contracts. See id. at 1032-33. Schumer's allegations concerned only false claims submitted to the government between 1982 and 1984. See id. at 1032. Noting the temporal discrepancy, the Lujan Court nevertheless held that Schumer's publicly disclosed 1982-1984 allegations also disclosed Lujan's 1982-1989 allegations, including the 1985-1989 allegations. "Lujan's allegations are substantially similar to those disclosed in the earlier Schumer action, thereby constituting `public disclosure' of Lujan's qui tam claims." Id. at 1033.
The same is true in the present case. Regardless which annual grant application the court considers, plaintiffs' allegations remain substantially the same as those previously disclosed, i.e., fraudulent PHMAP self-assessment and certification. As such, plaintiffs' 1995 allegations were publicly disclosed by the 1992 HUD audit, the subcommittee hearing and the Independent article.

2. Original Source
To avoid the jurisdictional bar, plaintiffs must therefore show that they were the original source of the information on which the publicly disclosed allegations were based. "A `whistleblower' sounds the alarm; he does not echo it." Wang, 975 F.2d at 1419.
To qualify as an "original source," a plaintiff must show that he or she: (1) has direct and independent knowledge of the information on which the allegations are based; (2) voluntarily provided the information to the government before filing the qui tam action; and (3) had a hand in the public disclosure of allegations that are a part of the suit. See United States ex rel. Devlin v. California, 84 F.3d 358, 360 fn. 3 (9th Cir.1996) (citing Wang, 975 F.2d at 1418).
Defendants assert that neither Rosales nor Meadows: (1) had direct and independent knowledge of the information on *998 which the allegations are based, or (2) had a hand in the public disclosure of the information.
To satisfy the "direct and independent knowledge" requirement, plaintiffs must "see the fraud with their own eyes or obtain their knowledge of it through their own labor unmediated by anything else." Id. at 361. Defendants cite plaintiff Meadows' deposition testimony that he had no independent knowledge of the SFHA's procedure for reporting vacancy rates in 1991. See Margolis Decl., Exh. C., Meadows Depo. at 186:7-11. Plaintiffs point out that Meadows had direct information concerning "Ronnie Davis' alleged errant expenditure of COMP Grant funds." Opposition at 10:23-24 (citing Jones Decl., Exh. F, Meadows Depo. at 323:12-329:4). The record does not demonstrate that either side has proffered substantial evidence concerning the directness and independence of Meadows' knowledge of the allegations in suit.
Defendants contend that plaintiff Rosales could not have observed firsthand or directly participated in the misreporting of vacancy rates for the periods when she was Director of Grants and was not Eligibility Manager, i.e., the periods from March 1994 to November 1995, and April 1998 to the present. See Margolis Decl., Exh. B., Rosales Depo. at 26:1-11. Plaintiffs respond, to the contrary, that even as Director of Grants Rosales was present at staff meetings where the allegedly fraudulent conduct was encouraged by Gilmore. See Jones Decl., Exh. D., Rosales Interrog. Resp. No. 2. Defendants also assert that Rosales had no direct and independent knowledge concerning the SFHA operating reserves, and admitted receiving her information from Controller Lugenia Yates and Director of Finance Barry Stewart. See Margolis Decl., Exh. B, Rosales Depo. at 438:3-13. Plaintiffs do not counter this assertion.
The record on the "direct and independent knowledge" prong of the Devlin test is, at best, inconclusive. Since plaintiffs bear the burden of establishing by a preponderance of the evidence that they were the original source of the public allegations, and bear their burdens under Celotex and Matsushita, this failure of proof weighs heavily against jurisdiction. However, there is another decisive reason why jurisdiction does not lie.
Defendants contend that plaintiffs have offered no evidence that they had a hand in the public disclosures discussed above. Even though they are the parties bearing the burden of proof on the issue, plaintiffs have simply responded in conclusory fashion that they satisfy the third prong of the Devlin standard. See Opposition at 11:5-8. The only evidence proffered to support the contention that plaintiffs had a hand in the public disclosure of the allegations is a memorandum written by Rosales to Ronnie Davis dated December 10, 1996. See Rosales Decl. (filed Oct. 19, 1999), Exh. A. This memo is dated after the filing of the present lawsuit and long after the HUD audit, the subcommittee hearing and the Independent article became public. Even if the memorandum had been disclosed before suit, though, it was addressed to Ronnie Davis, who was then Acting Director of the SFHA. Thus, without more, it does not appear to have been part of any "public" disclosure of the allegations.
Because plaintiffs' allegations regarding improprieties in the SFHA's applications for HOPE VI and COMP grants were publicly disclosed before this suit, and plaintiffs have not established that they were original sources of the information, this court lack subject matter jurisdiction under 31 U.S.C. § 3730(e)(4). Accordingly, the court GRANTS summary judgment in favor of defendants on the HOPE VI and COMP grant claims.

*999 C. YAP and ADPCT Grants

Plaintiffs allege that defendants made false claims to the United States by applying for and receiving Youth Apprenticeship Program ("YAP") and Apprenticeship Demonstration Program in the Construction Trades ("ADPCT") grant funds, despite the presence of a "union only" clause in the memorandum of understanding ("MOU") in support of the grant application. In 1994-1995 the SFHA and San Francisco purportedly received $1,200,000 in YAP funds and $250,000 in ADPCT funds. But HUD regulations do not allow "union only" clauses in MOUs. Plaintiffs claim that the SFHA and San Francisco received the funds after promising to rewrite the MOU to comply with HUD regulations, a promise that was never kept.
Defendants argue that plaintiffs' allegations regarding the MOU were publicly disclosed by a prior lawsuit. United States ex rel. McKenzie v. BellSouth Tel., Inc., 123 F.3d 935, 939 (6th Cir.1997), cert. denied, 522 U.S. 1077, 118 S.Ct. 855, 139 L.Ed.2d 755 (1998) and Federal Recovery Servs., Inc. v. United States, 72 F.3d 447, 450 (5th Cir.1995) hold that 31 U.S.C. § 3730(e)(4)(A) treats information disclosed through civil litigation and on file with the clerk's office as a public disclosure of allegations.
On December 5, 1995 certain labor unions brought suit in this court in San Francisco Building and Construction Trades Council, et al. v. United States Department of Housing and Urban Development, San Francisco Housing Authority, et. al., No. C96-4328 SBA. See Def. Req. for Jud. Not., Exh. C. That complaint alleged that the SFHA had not complied with the MOU because it had been informed by HUD that compliance would violate HUD regulations. See id. at ¶¶ 11, 14. The complaint was filed ten days before plaintiffs filed the present lawsuit.
Plaintiffs do not make any arguments or offer any evidence to counter defendants' point. In fact, the only trace of opposition occurs in a footnote that addresses the merits of the claim and not the threshold issue of jurisdiction. See Opposition at 12 fn.8.[4] Given that plaintiffs bear the burden of proof on subject matter jurisdiction, this does not suffice.
Defendants have established that the prior suit recited the contested terms of the MOU and aired the allegations that the MOU violated HUD regulations. Since plaintiffs fail to contest the public disclosure and offer no evidence that they were the original source of the information, this court lacks subject matter jurisdiction. The court therefore GRANTS summary judgment in favor of defendants on the YAP and ADPCT grant claims.

D. Section 8 Certificates
Plaintiffs allege that defendants knowingly made false claims to the United States by securing Section 8 subsidized housing certificates from HUD for individuals who were ineligible. Plaintiffs further allege that SFHA employees "sold" for their personal profit Section 8 housing certificates *1000 to the ineligible individuals with the actual or constructive knowledge of the SFHA.
Under the Section 8 program "tenants make rental payments to private landlords based on the tenants' income and ability to pay, and HUD subsidizes that rent with assistance payments intended to provide the landlord with a fair rent." Bellevue Manor Associates v. United States, 165 F.3d 1249, 1250 (9th Cir.1999) (citing 42 U.S.C. § 1437f; Cisneros v. Alpine Ridge Group, 508 U.S. 10, 12, 113 S.Ct. 1898, 123 L.Ed.2d 572 (1993)). Congress mandated such assistance for "the purpose of aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing." 42 U.S.C. § 1437f(a). Each year, housing authorities like the SFHA enter into an Annual Contributions Contract ("ACC") with HUD. See id. § 1437f(b). Under its ACC, the SFHA requisitions the funds from HUD for eligible participants, see id. § 1437n, and HUD disburses the money to the SFHA via electronic fund transfers. The SFHA in turn disburses Section 8 checks to landlords, or transfers funds to their designated financial institutions, as rental assistance for the Section 8 certificate holders. See Cal. Health & Saf.Code § 34327.3; Cal. Welf. & Inst.Code § 16517.
Plaintiffs contend that at least 148 individuals who had not submitted applications and were not on the Section 8 waiting list received Section 8 housing, some at the behest of various San Francisco officials. They claim that the SFHA has not even accepted applications for Section 8 assistance since 1986 because the waiting list has been continuously full since that time. They also allege that their boss, former SFHA Executive Director David I. Gilmore, ordered plaintiff Rosales to issue Section 8 certificates to numerous individuals knowing that these individuals were not qualified under federal and state regulations.
Beyond the mere improper issuance of certificates, plaintiffs allege that SFHA employees charged applicants a "fee" to procure Section 8 housing for ineligible persons. Plaintiffs claim that these employees knew that their conduct was contrary to federal and state regulations. They also contend that the SFHA and San Francisco were aware, or should have been aware, of this practice of selling Section 8 certificates for the personal profit of the employees.

1. Public Disclosure and Original Source
Defendants argue that there was prior public disclosure of the Section 8 irregularities in Nguyen v. San Francisco Housing Authority, et al., No. C93-1127 FMS. See Motion at 8-9, 20-22; Def. Req. for Jud. Not., Exh. B. However, the Nguyen litigation concerned only the implementation of a so-called "priority transfer" policy.[5] That case did not purport to address the wide-ranging fraud in procurement of Section 8 certificates alleged by plaintiffs in this case. This is defendants' only evidence of prior public disclosure.
Defendants cite evidence to support their argument that Meadows and Rosales were not the original source of the Section 8 allegations. See, e.g., Motion at 16:13-14, *1001 17:7-19. However, plaintiffs do not have to demonstrate they were the original source of the information until it has been established that the allegations were publicly disclosed before their suit. See United States ex rel. Hagood v. Sonoma County Water Agency, 929 F.2d 1416, 1420 (9th Cir.1991) (original source analysis "comes into play only if an exception is sought to the bar of [31 U.S.C. § 3730(e)(4)(A)]"). Because the fact of public disclosure is not established here, the original source analysis is unnecessary. The jurisdictional bar of 31 U.S.C. § 3730(e)(4)(A) does not apply. Accordingly, defendants' further arguments for summary judgment on the Section 8 claims must be addressed.

2. Sales of Housing Opportunities as False Claims
Defendants' first argument is that plaintiffs have no admissible evidence other than "hearsay, speculation, conjecture, rumor and innuendo" to support their claim that agents of the SFHA sold Section 8 certificates to ineligible individuals. Motion at 21:4-7. This position is untenable, both from the record in this case and from the parallel criminal convictions.
Plaintiffs have offered as evidence the criminal indictment filed on November 10, 1999, CR-99-0480 CAL, against SFHA employees Yolanda Bradley (a/k/a Yolanda Jones), Patricia Williams and others. Attached to the original criminal complaint was the sworn affidavit of Special Agent Juan C. Juarez of the HUD Office of Inspector General. The Juarez affidavit detailed several instances of fraudulent conduct in the procurement of Section 8 housing by SFHA employees and supervisors.
Criminal defendants Yolanda Jones and Ena Coleman pled guilty to several charges arising from the sale of Section 8 certificates. Defendant and SFHA employee Patricia Williams was also convicted by a jury of one count of conspiracy (18 U.S.C. § 371), seven counts of accepting a bribe in programs receiving federal funds (18 U.S.C. § 666(a)(1)(B)), and twenty-two counts of submitting false documents to HUD (18 U.S.C. § 1001). In addition, numerous tenants pled guilty to charges of paying bribes and receiving Section 8 certificates for which they were not eligible. The record of fraud in the issuance of Section 8 certificates is overwhelming. The evidence is copious.
Defendants then argue that the "sale" of Section 8 certificates by SFHA employees is not a false claim under the FCA because it does not result in harm to the U.S. Treasury. See Motion at 21:11-19. The Ninth Circuit has recently rejected this argument. See Bly-Magee v. California, 236 F.3d 1014, 1017 (9th Cir.2001) ("a qui tam plaintiff need not prove that the federal government will suffer monetary harm to state a claim under the FCA.") (citations omitted).[6]
More to the point, defendants' argument understates plaintiffs' allegations. Plaintiffs also allege that SFHA employees and supervisors knowingly and fraudulently certified ineligible individuals as eligible for Section 8 certificates. The false claim *1002 is not the SFHA agent's receipt of money from an ineligible individual; rather, the false claim is the false information submitted to the government by the SFHA agent to secure the Section 8 certificates.
The FCA defines a "claim" as:
any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States government provides any portion of the money or property which is requested or demanded, or if the government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.
31 U.S.C. § 3729(c). It is undisputed that holders of Section 8 certificates received subsidies from HUD to supplement the rent they paid to their landlords. See Bellevue Manor Associates v. United States, 165 F.3d 1249, 1250 (9th Cir.1999). That money came from the U.S. Treasury. If SFHA agents knowingly submitted false documentation to secure Section 8 certificates for ineligible individuals, as plaintiffs allege and is supported by evidence, this would be a "false claim" for purposes of the FCA. "It is the false certification of compliance which creates liability when certification is a prerequisite to obtaining a government benefit." United States ex rel. Hopper v. Anton, 91 F.3d 1261, 1266 (9th Cir.1996), cert. denied, 519 U.S. 1115, 117 S.Ct. 958, 136 L.Ed.2d 844 (1997). See 42 U.S.C. § 1427d(c)(2).

3. Scienter
Defendants next argue that neither the SFHA nor San Francisco had the requisite scienter to subject them to liability under the FCA. They contend that even if some SFHA employees used a scheme to make money on Section 8 certificates, plaintiffs have not established that the SFHA or San Francisco were "knowingly" involved in the submission of the false claims. See Motion at 21:19-22:3.
Under the FCA liability can be imposed on anyone who "knowingly presents, or causes to be presented, to an officer or employee of the United States government ... a false or fraudulent claim for payment or approval"; or "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the government"; or "conspires to defraud the government by getting a false or fraudulent claim allowed or paid." 31 U.S.C. § 3729(1)-(3). "Knowingly" and "knowingly" mean that a person, with respect to the false information:
(1) has actual knowledge of the information;
(2) acts in deliberate ignorance of the truth or falsity of the information; or
(3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent is required.
31 U.S.C. § 3729(b). See United States ex rel. Hochman v. Nackman, 145 F.3d 1069, 1073 (9th Cir.1998).
The evidence demonstrates that Patricia Williams, the SFHA's Relocation Manager, knowingly submitted false documents to HUD to secure Section 8 certificates for ineligible individuals. She was convicted of doing so. Williams has described herself as "a management level employee" at the SFHA. See Jones Decl., Exh. J, Williams Decl. at 1. Yolanda Jones, Williams' subordinate, also pled guilty to participating in the Section 8 scheme.
In addition to the evidence against Williams and Jones, plaintiff Rosales testifies as follows:
As Eligibility Manager at the SFHA I observed and was ordered to issue Section *1003 8 housing certificates to individuals who had not submitted applications for same, and who were not on the waiting list for Section 8 housing. The SFHA has not accepted applications for Section 8 housing since 1986 because the wait list is full. Nonetheless, from approximately 1990 through January 1994, at least 148 Section 8 certificates were issued to individuals who were not on the SFHA waiting list for Section 8 housing or had submitted an application for the same.
Jones Decl., Exh. H, Rosales Statement at U00004. Rosales specifically states that SFHA Executive Director David Gilmore ordered her to issue Section 8 certificates to several named persons even though Gilmore knew that those individuals had not submitted applications, were not on the waiting list, and were ineligible for Section 8 housing. See id. at U00004-00005.
When, as here, managers and executives are implicated in the knowing submission of false claims to the government, there can be little question that the entity itself is answerable for their conduct. Defendants ask the court to require proof that the SFHA, and not just particular employees, "knowingly" submitted the false claims. This is a false distinction. Corporate entities such as the SFHA can only act through their agents. See Protectus Alpha Nav. Co., Ltd. v. North Pacific Grain Growers, Inc., 767 F.2d 1379, 1386 (9th Cir.1985) ("We agree that a corporation can act only through its agents and employees, and that no reasonable distinction can be made between the guilt of the employee in a managerial capacity acting within the scope of his employment and the guilt of the corporation."). When an agent acts in the name of the entity, taking advantage of her unique position within the entity to secure government funding, the fraudulent intent of the agent is indistinguishable from the intent of the entity. So long as the agent has actual or apparent authority to bind the entity, the fraud of the agent is sufficient to support civil liability against the entity. See American Society of Mechanical Engineers v. Hydrolevel Corp., 456 U.S. 556, 568, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982) (discussing the "wide variety of areas" in which federal courts "have imposed liability upon principals for the misdeeds of agents acting with apparent authority").
Citing United States v. Ridglea State Bank, 357 F.2d 495, 498 (5th Cir.1966) and its progeny, defendants argue that under the FCA the scienter of employees can only be imputed to the agency if the employees "intended to benefit" the agency by making the false claims to the United States. See Def. Suppl. Mem. (filed Oct. 14, 1999) at 2:8-9, 7:13-18; Reply at 11:1-28. The cases on this issue from around the United States are inconclusive. Defendants point out that the Fifth and Eleventh Circuits have consistently applied the "intent to benefit" test because of the "drastically penal" nature of the sanctions available under the FCA. See Def. Suppl. Mem. at 4-5 (citing Grand Union Co. v. United States, 696 F.2d 888, 891 (11th Cir.1983), United States v. Hangar One, Inc., 563 F.2d 1155, 1158 (5th Cir.1977) and Henry v. E. S., 424 F.2d 677, 679 (5th Cir.1970)). But there are cases to the contrary. See United States v. Fox Lake State Bank, 240 F.Supp. 720, 722 (N.D.Ill. 1965) (concluding that under the FCA "the fraudulent acts of an agent clothed with authority by a principal are imputable to said principal despite his alleged lack of consent."), aff'd in part and rev'd in part on other grounds, 366 F.2d 962 (7th Cir. 1966); United States v. O'Connell, 890 F.2d 563, 569 (1st Cir.1989) (holding that a corporation can be liable under the FCA for the fraudulent representations of its agent under traditional agency principles "even if the corporation received no benefit from the agent's fraud"); United States v. *1004 Incorporated Village of Island Park, 888 F.Supp. 419, 438 (E.D.N.Y.1995) (following O'Connell). See generally Deborah Sprenger, "Corporation's Vicarious Liability for Fraud of its Agent under False Claims Act (31 U.S.C.A. §§ 3729-3733)," 107 A.L.R.Fed. 665 (1992).
However, there is no need for this court to address the conflicting authority from other circuits. It is clear that the Ninth Circuit has not embraced the "intent to benefit" rule of Ridglea. The Ninth Circuit has reiterated its conclusion that under the FCA "the requisite scienter is `the knowing presentation of what is known to be false' and that `known to be false' does not mean scientifically untrue; it means a lie." United States ex rel. Hochman v. Nackman, 145 F.3d 1069, 1073 (9th Cir. 1998) (citations omitted). The Ninth Circuit has given no indication that anything other than the traditional rules of vicarious liability apply in analyzing scienter, even if, as defendants assert, the damages at stake are substantial. See Protectus Alpha Nav. Co., Ltd. v. North Pacific Grain Growers, Inc., 767 F.2d 1379, 1387 (9th Cir.1985) (adopting the standard of Restatement (Second) of Torts § 909 and allowing "imposition of punitive damages" on a corporation for the "egregious acts of one employed in a managerial capacity and acting in the scope of employment"). This court will not take it upon itself to adopt an "intent to benefit" limitation that is absent from the statutory language of the FCA and the case law of this circuit.
The evidence cited above suffices to establish a triable issue of fact regarding defendant SFHA's knowledge of the false claims submitted by Williams and Rosales (upon Gilmore's alleged orders) to HUD.
As for defendant the City and County of San Francisco, however, plaintiffs offer only speculation. Plaintiff Rosales surmises that some of the Section 8 housing certificates "may have been issued by Mr. Gilmore as a political favor." See Jones Decl., Exh. H, Rosales Statement at U00004. This statement is insufficient to survive a motion for summary judgment by the city. And the scienter of Williams, Jones and Gilmore  as agents of the SFHA which is, in turn, a legal agency of the city  is linked to the city by insufficient evidence for a reasonable jury to find in favor of plaintiffs on this point. Accordingly, the court GRANTS summary judgment in favor of the City and County of San Francisco on the Section 8 claims. Since none of the Section 8 allegations appear to involve defendant Albert Nelson, the court also GRANTS summary judgment in his favor on the first claim for relief.

4. Does the FCA Authorize Private Suit Against a Local Governmental Entity Such as the SFHA?
Defendant SFHA argues that recent U.S. Supreme Court case law precludes private FCA claims against local governmental entities. Because this issue is a novel one, with little appellate authority directly on point, the court will address it in some detail.
On June 24, 1999 the Supreme Court granted certiorari in United States ex rel. Stevens v. Vermont Agency of Natural Resources, a qui tam action brought by a private plaintiff against a state agency under the FCA. See 527 U.S. 1034, 119 S.Ct. 2391, 144 L.Ed.2d 792 (1999). On November 19, 1999 the Supreme Court broadened its grant of certiorari to address the following question: "Does a private person have standing under Article III to litigate claims of fraud upon the government?" See 528 U.S. 1015, 120 S.Ct. 523, 145 L.Ed.2d 404 (1999). Ultimately, the Court addressed a relatively narrow question, to wit: "whether a private individual may bring suit in federal court on behalf of the *1005 United States against a State (or state agency) under the False Claims Act, 31 U.S.C. §§ 3729-3733." Vermont Agency of Natural Resources v. United States ex rel. Stevens, 529 U.S. 765, 120 S.Ct. 1858, 1860, 146 L.Ed.2d 836 (2000).
After Vermont Agency was decided, the parties submitted supplemental briefing on the applicability of that decision to the present case. This court heard further argument on the question. The issue now is whether the FCA, after the Vermont Agency decision, authorizes a private suit against a local entity such as the SFHA.

a. The Vermont Agency Decision
In Vermont Agency, the relator/plaintiff alleged that his former employer, the Vermont Agency of Natural Resources, had submitted false claims to the Environmental Protection Agency in connection with various federal grant programs. See id. at 1861. The United States elected not to intervene. See id. Defendant moved to dismiss, arguing that a state or state agency is not a "person" subject to liability under the FCA, and that a qui tam action in federal court against a state or state agency is barred by the Eleventh Amendment. See id. The district court denied the motion, a divided panel of the Second Circuit affirmed on interlocutory appeal, and the Supreme Court granted certiorari.
The Supreme Court, per Justice Scalia, reversed. "We hold that a private individual has standing to bring suit in federal court on behalf of the United States under the False Claims Act, 31 U.S.C. §§ 3729-3733, but that the False Claims Act does not subject a State (or state agency) to liability in such actions." Id. at 1871. Since the Court resolved the question of state liability on statutory grounds, it did not reach the Eleventh Amendment defense. Id. at 1870.
Analyzing the Article III limitations on qui tam lawsuits brought by private individuals, the Court first restated what it called the "irreducible constitutional minimum" of standing. Id. at 1862 (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). The three requirements for a plaintiff to establish Article III standing are: (1) injury in fact; (2) causation; and (3) redressability. See id. at 1861-62.
In the course of deciding that qui tam relators do have standing under Article III, the Court focused most of its attention on the injury-in-fact requirement. Justice Scalia emphasized that the relator's interest in the litigation, i.e., the bounty he will receive if successful, does not suffice to confer standing: "[A]n interest that is merely a `byproduct' of the suit itself cannot give rise to a cognizable injury in fact for Article III standing purposes." Id. at 1863. Rather, the Court concluded that the United States' injury in fact suffices to confer standing on the qui tam relator: "We believe ... that adequate basis for the relator's suit for his bounty is to be found in the doctrine that the assignee of a claim has standing to assert the injury in fact suffered by the assignor." Id. at 1863.
In addressing whether states or state agencies are "persons" subject to qui tam liability under the FCA, the Court ultimately held that the ambit of "person" in 31 U.S.C. § 3729(a) should not include states or state agencies: "In sum, we believe that various features of the FCA, both as originally enacted and as amended, far from providing the requisite affirmative indications that the term `person' included States for purposes of qui tam liability, indicate quite the contrary." Id. at 1870.
The Court stated three reasons for concluding that "person," within the meaning of 31 U.S.C. § 3729(a), does not comprehend States or state agencies. First, the Court adverted to the "longstanding interpretive *1006 presumption that `person' does not include the sovereign." Id. at 1866. Second, the Court reviewed the text and history of the FCA, from its enactment to the present day, finding no affirmative indication that the statute's definition of "person" was ever intended to include States. See id. at 1867-68. Third, the Court analyzed three structural features of the current statutory scheme that are consistent with the presumption against imposing FCA liability on States or state agencies: (1) the express definition of "person" to include States in the FCA's civil investigative demand provisions at 31 U.S.C. § 3733(l)(4); (2) the availability of damages that are "essentially punitive in nature," including treble damages and a civil penalty of up to $10,000 per claim, contrary to the common-law presumption against imposing punitive damages on "governmental entities"; and (3) the presence of a sister scheme to the FCA, the Program Fraud Civil Remedies Act of 1986, that does not include States as "persons" subject to liability. See id. at 1868-70.
Finally, the Court mentioned two further considerations supporting the result: (1) the rule of statutory construction requiring Congress to make its intent to alter the usual constitutional balance between the States and the Federal government "unmistakably clear"; and (2) the doctrine that statutes should be construed so as to avoid difficult constitutional questions. See id. at 1870. The Court closed by reiterating that its statutory holding made it unnecessary to address the Eleventh Amendment issues raised, although it expressed "serious doubt" on that score. See id.
In sum, the Vermont Agency decision stands for two propositions. First, private qui tam plaintiffs have Article III standing to sue under the FCA if the United States has suffered a cognizable injury in fact. Second, States and state agencies are not "persons" subject to liability under the FCA if the United States does not intervene in the suit.

b. Contentions of the Parties
The SFHA contends that Vermont Agency compels dismissal of plaintiffs' first cause of action as a matter of law:
In Vermont Agency, the Supreme Court held that although a private individual may have standing to bring suit in federal court on behalf of the United States under the False Claims Act, the individual may not sue states, state agencies, or other governmental entities under the Act. The Court grounded its decision on the language of the False Claims Act. It determined that a State is not a "person" within the meaning of 31 U.S.C. § 3729(a). A primary reason the court gave to support this result is that "the current version of the FCA imposes damages that are essentially punitive in nature, which would be inconsistent with state qui tam liability in light of the presumption against imposition of punitive damages on governmental entities."
Def. Notice (filed June 5, 2000) at 2 (citation omitted). Although the SFHA provides a more elaborate summary of Vermont Agency in its most recent brief, see Def. Suppl. Mem. (filed Aug. 11, 2000) at 3-5, it essentially advances the same argument. "In summary, Vermont Agency's broad language recognizing the presumptive immunity of `governmental entities' from punitive statutes and remedies, as well as the entirety of its stated rationale, includes municipalities within its protective sweep." Id. at 5.
Plaintiffs argue to the contrary regarding the effect of Vermont Agency: "Plaintiffs respectfully submit that Vermont Agency does nothing more than establish their standing to maintain this action." Pl. *1007 Suppl. Mem. (filed Aug. 25, 2000) at 8. After reviewing the Supreme Court's opinion with respect to the standing of qui tam relators, see id. at 3-4, plaintiffs contend that the Court's holding as to states and state agencies is not applicable to local entities such as the SFHA. They say that, "[s]ince neither the SFHA nor San Francisco is a sovereign state or state agency, the Vermont Agency decision does not bar the FCA claim Plaintiffs assert against them." Id. at 4.

c. Application of Vermont Agency to This Case
Plaintiffs are correct that Vermont Agency is not a bar to the present action. Defendants agree that the SFHA is neither a state nor state agency.[7] The Supreme Court's holding with respect to state defendants and their agencies under the FCA does not apply to the SFHA.
Defendant SFHA seizes on language in Vermont Agency regarding "governmental entities" to get the protections of the Court's holding. However, that language was dictum. In discussing the presumption against application of punitive statutes to "governmental entities," the Court was simply explaining why its conclusion  i.e., that the phrase "any person" in 31 U.S.C. § 3729(a) does not include states or state agencies  is consistent with the FCA's present features. There was no local entity before the Court in Vermont Agency, so it had no occasion to decide  and, contrary to the SFHA's position, did not decide  that an entity such as the SFHA is protected from FCA liability.
Given that the SFHA is not a state or state agency, plaintiffs are correct that the statutory holding in Vermont Agency does not bar plaintiffs' claims in this case. But the Court did not hold that such local agencies are liable under the FCA. That issue is raised by defendant SFHA and is now before this court. So the Court's reasoning in Vermont Agency is still relevant in deciding that issue. Since Vermont Agency and the cases preceding and following it provide guidance, some background is therefore appropriate.

i. Cases Before Vermont Agency

Before Vermont Agency, the few courts addressing the issue of local governmental liability were split. See Chandler v. Hektoen Institute for Medical Research, 35 F.Supp.2d 1078 (N.D.Ill.1999) (holding that county defendant is a "person" within meaning of FCA for purposes of suit by private plaintiff); U.S. ex rel. Garibaldi v. Orleans Parish School Board, 46 F.Supp.2d 546, 558-59 (E.D.La.1999) (concluding that states and municipalities are "persons" under the FCA); United States ex rel. Graber v. City of New York, 8 F.Supp.2d 343 (S.D.N.Y.1998) (holding that state and local governments and agencies are not "persons" under the FCA for purposes of suit by the U.S. government); see also United States ex rel. Dunleavy v. County of Delaware, 123 F.3d 734, 738-40 (3d Cir.1997) (holding that qui tam relator *1008 has right to proceed against county defendant); United States v. Incorporated Village of Island Park, 888 F.Supp. 419, 439-443 (E.D.N.Y.1995) (granting summary judgment against village defendant in FCA suit brought by U.S. government).
In United States ex rel. Stevens v. Vermont Agency of Natural Resources, 162 F.3d 195, 207 (2d Cir.1998), the Second Circuit impliedly overruled Graber, the only published opinion holding that local entities are not "persons" under the FCA.[8] Therefore, before the Supreme Court's reversal of the Second Circuit in Vermont Agency, the sparse case law appeared to support local governmental liability under the FCA. See John R. Hellow and Stacie K. Neroni, "The Federal False Claims Act: Can Whistle Blowers Reach State and Local Tax Dollars?," 44 ST. LOUIS U. L.J. 133, 153 (2000) ("The trend seems to favor finding local governments liable under the FCA.").
In light of Vermont Agency, the authorities underlying many of the local liability cases have now become suspect. For example, Chandler and Garibaldi relied extensively on Zissler and the Second Circuit's opinion in Vermont Agency. See Chandler, 35 F.Supp.2d at 1084; Garibaldi, 46 F.Supp.2d at 558-59. The Supreme Court's overruling of this underlying authority has shifted the focus; the issue of state liability under the FCA is now settled, whereas the issue of local liability is thrust into the limelight.

ii. Cases Since Vermont Agency

Since Vermont Agency there have been only two published opinions on point.[9] In U.S. ex rel. Dunleavy v. County of Delaware, 2000 WL 1522854 (E.D.Pa.1999) the court adopted reasoning similar to that urged by the SFHA in this case. See id. at *10 ("After consideration of the Stevens decision, I conclude that plaintiff's action may not continue against Delaware County due to the punitive nature of the damages mandated by the FCA.") and *16 ("Under the Stevens rationale, the FCA imposes mandatory damages that are punitive in nature that may not be brought by a qui tam relator against a county."). The court acknowledged that the issue of liability is analytically distinct from the measure of damages available; nevertheless, the court concluded that it could not impose damages consistent with the FCA (i.e., damages "essentially punitive in nature," as Vermont Agency put it) without running afoul of the rule disfavoring imposition of punitive damages on governmental entities. See id. at *8 ("The Stevens Court labeled this provision as punitive; therefore the only way to overcome the common law doctrine barring punitive damages against state subdivisions would be to allow suits under the FCA to go forward with some lesser form of damages to be imposed. However, since the FCA expressly provides a specific level of liability for violations of its provisions, adoption of this position would require me to rewrite the Act, an action clearly beyond my power.").
In Chandler v. Hektoen Institute for Medical Research, 118 F.Supp.2d 902 (N.D.Ill.2000) ("Chandler II"), the court disposed of the issue in less than two pages. The court agreed with Dunleavy that the availability of punitive damages bars suit against local governmental entities, *1009 but it reiterated its conclusion that a county is a "person" under the FCA. See id. at 903 ("Although this court finds no reason to alter its conclusion that the County is a `person' for purposes of the FCA, it is quite clear that under Stevens the County is immune from the imposition of punitive damages, which are mandatory if liability is found under the FCA.").

iii. Analysis
Although Dunleavy correctly identifies several difficult issues remaining in the aftermath of Vermont Agency, this court respectfully declines to follow Dunleavy. First, Dunleavy improperly isolates the Supreme Court's statement in Vermont Agency about punitive damages from the analytical framework of which it is a part; that is, the presumption against interpreting "person" to include a sovereign. Since a local agency is not a sovereign, the entire premise on which the Court was proceeding does not apply. Moreover, unlike the issue of states, there are several affirmative indications (discussed below) that Congress considered local governments to be "persons" when it passed the FCA.
Second, Dunleavy divorces Vermont Agency from the context of the Eleventh Amendment issues hovering at the borders of Vermont Agency. That context is absent when considering the FCA's application to a local entity rather than a state agency. As a result, there is no need here to read the expansive language "any person" in the FCA narrowly to avoid a constitutional question. Moreover, an Eleventh Amendment analysis clarifies that public corporations like the SFHA are presumptively "persons". In other words, a presumption opposite to the one at work in Vermont Agency applies to a local public corporation.
Third, Dunleavy converts the Supreme Court's brief mention of the FCA's damage provisions into a per se rule against municipal liability. In other words, Dunleavy reads the Court's dictum in Vermont Agency regarding the remedies available (damages that are "essentially punitive in nature" and "presumptively" unavailable against governmental entities) as conclusive of liability as such. Newport v. Fact Concerts, Inc., 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981) and its progeny do not preclude liability against localities; instead they merely ask whether punitive damages should be available once it has already been established that a municipality is a proper defendant, answerable for compensatory damages, under the relevant statute. See, e.g., Mitchell v. Dupnik, 75 F.3d 517, 526 (9th Cir.1996) ("Although a municipality may be liable for compensatory damages in § 1983 actions, it is immune from punitive damages under the statute.") (citing Newport 453 U.S. at 271, 101 S.Ct. 2748).
Some of the points mentioned above are scantily addressed by the extant case law, but are dispositive of the issues in this particular case. So some further discussion is appropriate.

(a) The SFHA is not a sovereign.
Local governments and agencies, from before passage of the FCA to the present day, have not been accorded the status of sovereigns. See Maryland ex rel. Washington County v. Baltimore & Ohio Railroad Co., 44 U.S. 534, 550, 3 How. 534, 11 L.Ed. 714 (1845) ("The several counties are nothing more than certain portions of territory into which the state is divided for the more convenient exercise of the powers of government. They form together one political body in which the sovereignty resides."); United States v. Kagama, 118 U.S. 375, 379, 6 S.Ct. 1109, 30 L.Ed. 228 (1886) ("The soil and the people [within the geographical limits of the United States] are under the political control of the government of the United States, or of the *1010 States of the Union. There exists within the broad domain of sovereignty but these two. There may be cities, counties, and other organized bodies with limited legislative functions, but they are all derived from, or exist in, subordination to one or the other of these."); City of Lafayette v. Louisiana Power & Light Co., 435 U.S. 389, 412, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978) ("Cities are not themselves sovereign; they do not receive all the federal deference of the States that create them.").
In short, unlike Vermont Agency, this case does not implicate the "legislative choice of authorizing private parties to haul sovereign states into federal court against their will." United States ex rel. Long v. SCS Business and Technical Institute, Inc., 173 F.3d 870, 883 (D.C.Cir. 1999), cert. denied, 530 U.S. 1202, 120 S.Ct. 2194, 147 L.Ed.2d 231 (2000).

(b) The SFHA is a statutory person.
There are affirmative indications that Congress regarded local governments and agencies as "persons" when it passed the FCA in 1863. As the Supreme Court has demonstrated in the context of 42 U.S.C. § 1983 litigation against municipalities, in the period under consideration "municipal corporations were routinely sued in the federal courts and this fact was well known to Members of Congress." Monell v. New York City Department of Social Services, 436 U.S. 658, 687-89, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (footnotes omitted). The Court reiterated and expanded on this conclusion two years later:
Since colonial times, a distinct feature of our Nation's system of governance has been the conferral of political power upon public and municipal corporations for the management of matters of local concern. As Monell recounted, by 1871, municipalities  like private corporations were treated as natural persons for virtually all purposes of constitutional and statutory analysis. In particular, they were routinely sued in both federal and state courts ... Local governmental units were regularly held to answer in damages for a wide range of statutory and constitutional violations, as well as for common-law actions for breach of contract.
Owen v. Independence, Missouri, 445 U.S. 622, 638-39, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1979) (emphasis added and footnotes omitted).
The Supreme Court again confirmed this understanding in Newport v. Fact Concerts, Inc., 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981): "It was generally understood by 1871 that a municipality, like a private corporation, was to be treated as a natural person subject to suit for a wide range of tortious activity[.]" Id. at 259, 101 S.Ct. 2748 (footnote omitted). Although the Newport Court went on to conclude that "this understanding did not extend to the award of punitive or exemplary damages" against a municipality, id. at 260, 101 S.Ct. 2748, the Court carefully separated the issue of liability as such from the narrower issue of the availability of punitive damages. See id. at 249, 101 S.Ct. 2748 (noting that the Court had previously held that "a local government was subject to suit as a `person' within the meaning of 42 U.S.C. § 1983" in Monell, but that municipal liability for punitive damages presented a separate question).
It is clear that Congress regarded municipalities as natural persons at the time of the FCA's enactment. There is no need to revisit the vast body of legislative, judicial, historical and scholarly evidence already marshaled by the Supreme Court to support this conclusion. See generally Owen, supra, at 638-50, 100 S.Ct. 1398; Monell, supra, at 687-89, 98 S.Ct. 2018.
The Eleventh Amendment background to Vermont Agency confirms this conclusion. One of the key reasons the Supreme *1011 Court based its holding in Vermont Agency on statutory grounds was "the doctrine that statutes should be construed so as to avoid difficult constitutional questions." Vermont Agency, 120 S.Ct. at 1870 (citing Ashwander v. TVA, 297 U.S. 288, 348, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring)). Application of the FCA to states would have presented an Eleventh Amendment question. See United States ex rel. Long v. SCS Business and Technical Institute, Inc., 173 F.3d 870, 881-86 (D.C.Cir.1999). In Vermont Agency the Court avoided this problem in the same way as did the D.C. Circuit before it. See Long, 173 F.3d at 886 ("Instead, bearing in mind that we must decide this difficult constitutional issue only if the term person in the Act is interpreted as including states, and that it seems quite dubious that Congress intended that result, the appropriate course seems to us to interpret `person' as not including states.").
The "difficult constitutional issue" avoided by narrow construction in Long and Vermont Agency is absent from the present case. Eleventh Amendment jurisprudence, from the time of the FCA's passage to the present, has made it clear that local governments and agencies are not arms of the state partaking of its sovereign immunity:
The Eleventh Amendment limits the jurisdiction only as to suits against a State ... [A]nd while the county is territorially a part of the State, yet politically it is also a corporation created by and with such powers as are given to it by the State. In this respect, it is a part of the State only in that remote sense in which any city, town, or other municipal corporation may be said to be a part of the state.
Lincoln County v. Luning, 133 U.S. 529, 530, 10 S.Ct. 363, 33 L.Ed. 766 (1890). See also William A. Fletcher, "The Eleventh Amendment: Unfinished Business," 75 NOTRE DAME L.REV. 843, 850-51 (2000) ("Lincoln County v. Luning was based on an early conception of a city (and, by extension, a local government) as a corporation independent of the state, a conception that has survived anachronistically in current Eleventh Amendment law."). Accordingly, Eleventh Amendment immunity has been consistently denied to cities, counties and other local entities absent a showing that they are in fact an arm of the state. See Alden v. Maine, 527 U.S. 706, 756, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999) ("The immunity does not extend to suits prosecuted against a municipal corporation or other governmental entity which is not an arm of the state."); Hale v. Arizona, 993 F.2d 1387, 1399 (9th Cir.1993) (applying five-part test for arm-of-the-state analysis under the Eleventh Amendment).
As discussed earlier, California does not regard the SFHA as an arm of the state. See Lynch v. San Francisco Housing Authority, 55 Cal.App.4th 527, 65 Cal.Rptr.2d 620 (1997). The SFHA is therefore "to be treated as a municipal corporation or other political subdivision to which the Eleventh Amendment does not extend." Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). See also Monell, 436 U.S. at 691 n. 54, 98 S.Ct. 2018 ("[L]ocal government units ... are not considered part of the State for Eleventh Amendment purposes."). Accordingly, unlike in Vermont Agency, there is no "difficult constitutional question" to avoid by construing the FCA so as not to apply to the SFHA. Nor does this case implicate the constitutional balance between the states and the federal government, another concern supporting the result in Vermont Agency. See 120 S.Ct. at 1870 (citing Will v. Michigan Dept. of State Police, 491 U.S. 58, 65, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)).
*1012 The absence of such constitutional constraint weighs against narrow construction of the FCA. In the absence of constitutional concerns, like those present in Vermont Agency, the Supreme Court has emphasized that the FCA should be read broadly to effectuate its goals, i.e., to protect the funds of the government from fraudulent claims. See United States v. Neifert-White Co., 390 U.S. 228, 232, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968) ("In the various contexts in which questions of the proper construction of the Act have been presented, the Court has consistently refused to accept a rigid, restrictive reading, even at the time when the statute imposed criminal sanctions as well as civil.") (footnote and citation omitted); United States ex rel. Newsham v. Lockheed Missiles, 190 F.3d 963, 965-66 (9th Cir.1999) ("The FCA has two primary purposes: `to alert the government as early as possible to fraud that is being committed against it and to encourage insiders to come forward with such information where they would otherwise have little incentive to do so.'") (quoting from Biddle, 161 F.3d at 538-39).
Entities such as the SFHA are more properly regarded as corporations than sovereign states. California law treats local housing authorities as "public corporations." See Lynch, 55 Cal.App.4th at 540, 65 Cal.Rptr.2d 620 (citing Cal. Health & Safety Code § 34203 and Cal. Gov.Code §§ 900.4, 970 subd. c). In applying its own qui tam statute California does not distinguish local governmental entities from private corporations. See LeVine v. Weis, 68 Cal.App.4th 758, 765, 80 Cal.Rptr.2d 439 (1998) ("There is no reason to conclude the Legislature intended that the protection afforded to the public treasury by the act be denied merely because the entity raiding the treasury is a governmental entity."). And Supreme Court jurisprudence applies the opposite presumption to public corporations as it does to states. See Vermont Agency, 120 S.Ct. at 1868 ("[T]he presumption with regard to corporations is just the opposite of the one governing here: they are presumptively covered by the term `person,' see 1 U.S.C. § 1.") and 1869 fn. 14 ("Unlike States, all of those entities [i.e., `any natural person, partnership, corporation, association, or other legal entity'] are presumptively covered by the term `person.' See 1 U.S.C. § 1."). 1 U.S.C. § 1, in turn, provides:
In determining the meaning of any Act of Congress, unless the context indicates otherwise ... the words `person' and `whoever' include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals.
1 U.S.C. § 1. Thus, much of the Court's analysis in Vermont Agency  which flows from the presumption against construing "person" to include a state  cuts in the opposite direction when it comes to local public corporations. For example, the Program Fraud Civil Remedies Act of 1986, which the Court cites as evidence that States are not persons under the FCA, (see Vermont Agency, 120 S.Ct. at 1870), expressly defines "person" to include "any ... corporation." See 31 U.S.C. § 3801(a)(6). In total, Vermont Agency supports, rather than undermines, the conclusion that local entities are "persons" subject to private lawsuit under the FCA.

(c) The FCA's Damages Provisions Do Not Preclude the SFHA from Being a Statutory Person.
Dunleavy and the SFHA put too much weight on Justice Scalia's brief remarks regarding the damages available under the FCA. They place great emphasis on the fact that the Supreme Court "labeled" the FCA as "punitive" in Vermont Agency. See Dunleavy, 2000 WL 1522854 at *9. Justice Scalia simply observed that "state qui tam liability," and the availability of *1013 damages under the FCA that are "essentially punitive in nature," would be inconsistent with the presumption against imposing punitive damages on "governmental entities." See Vermont Agency at 1869-70 (emphases added). The Court did not hold that local governmental entities are not persons under the FCA. Nor did the Court hold that the damages available under the FCA are "punitive damages" in the strict sense of the term. On the contrary, the Court was merely demonstrating why the presumption against interpreting "person" to include states or state agencies makes sense in light of the current features of the FCA.
Whatever Congress may have done to enhance the damages available under the FCA, the U.S. Supreme Court has consistently recognized that the purposes of the FCA in 1863 were essentially compensatory. See United States ex rel. Marcus v. Hess, 317 U.S. 537, 551-52, 63 S.Ct. 379, 87 L.Ed. 443 (1943) ("We think the chief purpose of the statutes here was to provide for restitution to the government of money taken from it by fraud, and that the device of double damages plus a specific sum was chosen to make sure that the government would be made completely whole."); Rainwater v. United States, 356 U.S. 590, 592, 78 S.Ct. 946, 2 L.Ed.2d 996 (1958) ("It seems quite clear that the objective of Congress was broadly to protect the funds and property of the government from fraudulent claims, regardless of the particular form, or function, of the government instrumentality upon which such claims were made."); United States v. Neifert-White Co., 390 U.S. 228, 233, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968) ("This remedial statute reaches beyond `claims' which might be legally enforced, to all fraudulent attempts to cause the government to pay out sums of money."); United States v. Bornstein, 423 U.S. 303, 315, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976) ("[P]ast decisions of this Court have reflected a clear understanding that Congress intended the double-damages provision to play an important role in compensating the United States in cases where it has been defrauded."); United States v. Halper, 490 U.S. 435, 446, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989) ("[T]he government is entitled to rough remedial justice, that is, it may demand compensation according to somewhat imprecise formulas, such as reasonable liquidated damages or a fixed sum plus double damages[.]"). So have circuit court decisions. See, e.g., United States ex rel. Dunleavy v. County of Delaware, 123 F.3d 734, 739 (3d Cir.1997) ("[T]he False Claims Act's purpose is not limited to punishing the wrongs against the general public; the FCA also fills a remedial capacity in redressing injury to the individual relator."); Toepleman v. United States, 263 F.2d 697, 699 (4th Cir.1959), cert. denied, 359 U.S. 989, 79 S.Ct. 1119, 3 L.Ed.2d 978 (1959) ("Without converting it into a criminal penalty, a statutory forfeiture of money has always been demandable of a wrongdoer by civil process though its purpose and effect be punishment."); United States v. Brekke, 97 F.3d 1043, 1048 (8th Cir.1996) cert. denied, 520 U.S. 1132, 117 S.Ct. 1281, 137 L.Ed.2d 356 (1997) ("A multiple recovery of this type is compensatory rather than punitive, even though it contains a penalty element[.]"); United States ex rel. Neher v. NEC Corp., 11 F.3d 136, 139 (11th Cir.1993) ("The FCA's qui tam provisions do not act as a penalty; rather they provide incentive to government `whistleblowers' and compensate such individuals for their time and trouble.").
If the Supreme Court's conclusion that a state is not a "person" under the FCA turned on the availability of damages that are "essentially punitive in nature," as the SFHA contends, the status of "person" would have changed correspondingly from including states and state agencies to excluding *1014 them when the damages were raised in 1986. As the Court's analysis demonstrates, however, the FCA never contemplated that "person" included states or state agencies. See id. at 1870 ("In sum, we believe that the various features of the FCA, both as originally enacted and as amended, far from providing the requisite affirmative indication that the term `person' included States for purposes of qui tam liability, indicate quite the contrary.") (emphasis added).
The existence of liability under the FCA cannot be confused with the availability or non-availability of treble damages as a remedy. In other words, a municipal defendant can be a "person" under the FCA, as it is under the antitrust laws, regardless of the presence or absence of treble damages as a remedy. See City of Lafayette v. Louisiana Power & Light Co., 435 U.S. 389, 394-97, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978) (holding that the definition of "person" or "persons" liable under the antitrust laws clearly includes cities); Community Communications Co. v. City of Boulder, 455 U.S. 40, 56, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982) (stating that the antitrust laws, "like other federal laws imposing civil or criminal sanctions upon `persons,' of course apply to municipalities as well as to other corporate entities."). Put another way, the intent of Congress in 1986 (arguably to enhance the punitive aspects of the FCA) should not be confused with the antecedent question of whether Congress in 1863 intended local governments and their agencies to be "persons" under the Act. See Vermont Agency, 120 S.Ct. at 1868 fn. 12 ("the term `person' has remained in the statute unchanged since 1863."). It is hard to believe that Congress in 1986 would express its intent to exempt localities from FCA liability by so subtle a means as increasing the penalties available under the statute.
Whatever one's views on the value of legislative history, particularly when a later Congress is interpreting the enactments of a prior Congress, it is apparent that the Senate regarded the FCA as applicable to local governments when it passed the damage enhancements in 1986. See S.Rep. No. 345, 99th Cong., 2d Sess. (1986), reprinted in U.S.C.C.A.N. 5266, 5273 ("The False Claims Act reaches all parties who may submit false claims. The term `person' is used in its broad sense to include partnerships, associations, and corporations ... as well as States and political subdivisions thereof.").
In sum, taking into account all of the factors considered by Vermont Agency, this court concludes that the SFHA is a "person" subject to private lawsuit under the FCA. The court is further confirmed in this conclusion by the prior law of this circuit. Before Vermont Agency, the law of the Ninth Circuit permitted FCA suits brought by private individuals against states or state agencies. See United States ex rel. Fine v. Chevron, U.S.A., Inc., 39 F.3d 957, 963 (9th Cir.1994) (holding that qui tam actions against states and state agencies are not barred by the Eleventh Amendment), vacated on other grounds, 72 F.3d 740 (9th Cir.1995) (en banc), cert. denied, 517 U.S. 1233, 116 S.Ct. 1877, 135 L.Ed.2d 173 (1996). Governmental entities at the state and local levels have often appeared in our courts as defendants in actions brought by relators under the FCA. See, e.g., A-1 Ambulance Service, Inc. v. California, 202 F.3d 1238 (9th Cir.2000) (State of California); United States ex rel. Hopper v. Anton, 91 F.3d 1261 (9th Cir.1996) (Los Angeles County Unified School District); United States ex rel. Devlin v. State of California, 84 F.3d 358 (9th Cir.1996) (State of California and County of Merced); United States ex rel. Hagood v. Sonoma County Water Agency, 929 F.2d 1416 (9th Cir.1991) (Sonoma *1015 County Water Agency); United States ex rel. Ericson v. City College of San Francisco, 1999 WL 221057 (N.D.Cal.1999) (City College of San Francisco); Clemes v. Del Norte County United School District, 1996 WL 331096 (N.D.Cal.1996) (Del Norte County Unified School District).
Although Vermont Agency now conclusively establishes that states and state agencies are immune from private suit under the FCA, that is not true of cities or counties and their agencies. It is up to the Ninth Circuit or the Supreme Court to decide whether the settled assumptions about municipal liability under the FCA should be revisited.
For the reasons discussed above, the court concludes that the SFHA is a statutory "person" subject to private lawsuit under the FCA.

5. Damages
Defendant SFHA further argues that even if it is a "person" subject to a private lawsuit under the FCA, the SFHA cannot be subjected to an award of punitive damages. The SFHA cites City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), for the proposition that "[m]unicipal entities are immune from liability for punitive or exemplary damages." Motion at 22:6-7.
The SFHA's argument rests on two assumptions. First, the SFHA asserts that the damages available under the FCA are "punitive damages" because they are not limited to actual damages suffered but instead consist of treble damages and substantial fines. See id. at 22:13-15. Second, the SFHA's argument assumes that the Newport decision flatly prohibits punitive damages against municipal entities. Both of those assumptions are questionable as applied to this case.
Are the damages and penalties currently available under the FCA "punitive damages" as that term of art is used by City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981)? Neither the Supreme Court nor the Ninth Circuit has adopted a bright line rule holding that treble damages, civil penalties or a combination of the two constitute "punitive damages." There are statements suggesting that treble damages and civil monetary penalties constitute punishment. See, e.g., Vermont Agency, 120 S.Ct. at 1869 ("the current version of the FCA imposes damages that are essentially punitive in nature"); Texas Industries, Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 639, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981) ("The very idea of treble damages reveals an intent to punish past, and to deter future, unlawful conduct, not to ameliorate the liability of wrongdoers."); Smith v. Wade, 461 U.S. 30, 85, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983) (Rehnquist, J., dissenting) (contrasting the absence of a punitive damages provision in § 1983 with the FCA's express authorization of civil forfeitures); Standard Oil Co. of Cal. v. Arizona, 738 F.2d 1021 (9th Cir.1984) (characterizing antitrust treble damages as "punitive damages"). However, these statements were made in dictum, in inapposite circumstances, or in dissenting opinions. There is no binding appellate authority holding that treble damages, civil penalties, or a combination of the two must constitute "punitive damages." See United States ex rel. Marcus v. Hess, 317 U.S. 537, 550, 63 S.Ct. 379, 87 L.Ed. 443 (1943) (noting that many state statutes impose "double or treble or even quadruple damages" in addition to criminal sanctions without this constituting second punishment under the Double Jeopardy Clause); but see Austin v. United States, 509 U.S. 602, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993) (holding that in rem forfeitures are "punishments" subject to limitation by the Excessive Fines Clause of the Eighth Amendment when exacted, at least in part, by the government); *1016 United States v. Mackby, 243 F.3d 1159 (9th Cir.2001) (holding that the FCA's purpose is, at least in part, punitive and FCA damages awards are therefore subject to limitation under the Excessive Fines Clause). Even the authority cited by the SFHA acknowledges that multiple damages should not be confused with punitive damages. See Graber, 8 F.Supp.2d at 348 fn. 1 ("`Clearly, multiple damages do retain elements of punishment and deterrence, even though multiple damages are not for all purposes equivalent to common law punitive damages.'") (quoting from Harris v. County of Racine, 512 F.Supp. 1273, 1281 (E.D.Wis.1981)); see also Smith v. Wade, 461 U.S. 30,36 fn. 5, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983) (distinguishing punitive civil remedies, including statutory awards of treble damages, from "a punitive damages remedy as such.").
Nor does Newport articulate a per se rule that municipalities are immune from any and all civil remedies that can be characterized as "punitive in nature." Rather than imposing a blanket rule barring a particular form of statutory damages, Newport instead mandates that the purposes of the statute (in that case, the Civil Rights Act of 1871 codified as 42 U.S.C. § 1983) and the policies underlying the immunity must be examined:
[T]he Court's willingness to recognize certain traditional immunities as affirmative defenses has not led it to conclude that Congress incorporated all immunities existing at common law. Indeed, because the 1871 Act was designed to expose state and local officials to a new form of liability, it would defeat the promise of the statute to recognize any preexisting immunity without determining both the policies that it serves and its compatibility with the purposes of § 1983. Only after careful inquiry into considerations of both history and policy has the Court construed § 1983 to incorporate a particular immunity defense.
Since Monell was decided three years ago, the Court has applied this two-part approach when scrutinizing a claim of immunity proffered by a municipality.
Newport, 453 U.S. at 258, 101 S.Ct. 2748 (citations omitted). The presumption in Newport is that Congress intended to "incorporate" preexisting common-law immunities, absent historical evidence or an articulated policy to the contrary.
Accordingly, this court will first examine the current FCA to determine whether its damages provisions constitute "punitive damages" as that term is understood by the Newport line of cases. Second, the court will analyze the purposes behind the FCA's damages provisions to determine whether the immunity policies articulated in Newport are implicated by application of the FCA to the SFHA.

a. The Text, Structure and Legislative History of the FCA Demonstrate that a Complex Combination of Compensation, Retribution and Deterrence Was Intended.
The Supreme Court has defined "punitive damages" in terms of their intended purpose: "Punitive damages by definition are not intended to compensate the injured party, but rather to punish the tortfeasor whose wrongful action was intentional or malicious, and to deter him and others from similar extreme conduct." Newport, 453 U.S. at 266, 101 S.Ct. 2748. This simple yet elusive distinction between compensation on the one hand, and punishment and deterrence on the other underlies much of the jurisprudence on punitive damages. "Exemplary or punitive damages are generally defined or described as damages which are given as an enhancement of compensatory damages because of the wanton, reckless, malicious, or oppressive *1017 character of the acts complained of, and in most jurisdictions, exemplary or punitive damages are awarded as a punishment to the defendant and as a warning and example to deter him and others from committing like offenses in the future." Joel E. Smith, "Recovery of Exemplary or Punitive Damages from Municipal Corporation," 1 A.L.R. 4th 448, 452 (1980).
The SFHA cites an antitrust case and a civil RICO case for the proposition that the availability of treble damages precludes suit against a municipality because such remedies are "punitive." See Motion at 22:18-22. (citing Texas Industries, Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 639, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981) and Genty v. Resolution Trust Corp., 937 F.2d 899 (3d Cir.1991)). However, there are differences between the structure of the antitrust laws and civil RICO on the one hand, and the FCA on the other hand.
The antitrust laws and civil RICO allow a private citizen to bring private suit for treble damages in their own name against persons engaging in anti-competitive behavior or racketeering respectively. However, under the FCA the relator sues on behalf of himself and the United States, in the name of the government, for false claims presented to the government. See 31 U.S.C. § 3730(b)(1) ("A person may bring a civil action for a violation of section 3729 for the person and for the United States. The action shall be brought in the name of the Government."). As the Supreme Court recognized in Vermont Agency, a qui tam relator "is, in effect, suing as a partial assignee of the United States." 120 S.Ct. at 1863 fn. 4.
Several consequences flow from this distinction. In an antitrust or civil RICO case, the plaintiff receives the treble damages if he prevails. Thus in Genty, the Third Circuit found civil RICO to be punitive, and hence unauthorized against a municipality, because it furnishes "a civil remedy far in excess of the amount necessary to compensate an injured RICO victim." Genty, 937 F.2d at 912. Under the FCA, on the other hand, the United States takes at least 70% and up to 85% of any recovery, depending on whether it chooses to intervene in the suit. See 31 U.S.C. § 3730(d)(1)-(2). Rather than providing a windfall for the qui tam plaintiff, the multiple damages under the FCA "compensate the government completely for the costs, delays, and inconveniences occasioned by fraudulent claims." United States v. Bornstein, 423 U.S. 303, 314, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976). Genty expressly distinguished RICO from the FCA on this basis. See Genty, 937 F.2d at 912 fn. 7 (citing Bornstein, 423 U.S. at 314, 96 S.Ct. 523).
The structure of the FCA reflects this unique government-relator relationship. An antitrust or RICO plaintiff is the master of her lawsuit. Not so with the FCA. The statute gives the United States substantial control over the relator's suit. See, e.g.: § 3730(b)(2) (government may intervene in the suit as of right within sixty days after receiving the relator's complaint, evidence, and information); § 3730(b)(1) (relator cannot dismiss her own suit without written consent of the court and the Attorney General); § 3730(c)(3)-(4) (even if the government does not intervene, it may monitor the proceedings and stay discovery in certain situations); § 3730(c)(3) (government may intervene at any time upon a showing of good cause); § 3730(c)(2)(A) (government may dismiss the suit after notice to the relator and a hearing); § 3730(c)(2)(B) (government may settle the suit with the defendant over the relator's objection if the court approves after a hearing).
In essence, unlike an antitrust or RICO plaintiff, a qui tam relator must yield substantial control of the suit to the government, *1018 surrender the lion's share of the award, and still bear the entire risk of failure. The FCA's damage provisions are structured to take these factors into account.
How does the FCA fare on its own unique terms? As discussed earlier, it is well settled that the FCA's purposes were remedial in nature before 1986. Before 1986 the question was much easier to answer because the statute then provided only for double damages and a civil penalty of $2,000 per claim. See 31 U.S.C. § 231 (1976 ed.). Thus, because a qui tam relator under the original statute was entitled to 50% of any recovery, the Supreme Court was able to conclude that private qui tam recoveries are compensatory in nature and do not constitute second punishment under the Double Jeopardy clause:
This remedy does not lose the quality of a civil action because more than the precise amount of so-called actual damage is recovered. As to the double damage provision, it cannot be said that there is any recovery in excess of actual loss for the government, since in the nature of the qui tam action the government's half of the double damages is the amount of actual damages proved.
United States ex rel. Marcus v. Hess, 317 U.S. 537, 550, 63 S.Ct. 379, 87 L.Ed. 443 (1943). The Court went on, however, to speculate about the effect that higher damage awards might have on the punitive dimension of the statute:
But in any case, Congress might have provided here as it did in the anti-trust laws for recovery of `threefold the damages ... sustained, and the cost of suit, including a reasonable attorney's fee.' 15 U.S.C. § 15. Congress could remain fully in the common law tradition and still provide punitive damages. `By the common as well as by statute law, men are often punished for aggravated misconduct or lawless acts, by means of civil action, and the damages inflicted by way of penalty or punishment given to the party injured.' Day v. Woodworth, 54 U.S. 363, 13 How. 363, 371, 14 L.Ed. 181. This Court has noted the general practice in state statutes of allowing double or treble or even quadruple damages. Missouri Pacific R. Co. v. Humes, 115 U.S. 512, 523, 6 S.Ct. 110, 29 L.Ed. 463. Punitive or exemplary damages have been held recoverable under a statute like this which combines provision for criminal punishment with others which afford a civil remedy to the individual injured. O'Sullivan v. Felix, 233 U.S. 318, 324, 34 S.Ct. 596, 58 L.Ed. 980. The law can provide the same measure of damage for the government as it can for an individual.
Id. at 550-51, 63 S.Ct. 379. Apparently Congress took the Court at its word. The FCA now provides for treble damages and enhanced civil penalties, but the relator's share of the recovery has been reduced from 50% to 15-30%. See 31 U.S.C. §§ 3729-3730. Accordingly, it is the FCA, as amended by the False Claims Amendments Act of 1986,[10] that must now be evaluated.
There is undoubtedly a punitive and deterrent dimension to the current damages and penalties authorized by the FCA. The legislative history straightforwardly announces this at several points. See S.Rep. No. 345, 99th Cong., 2d Sess. (1986), reprinted in U.S.C.C.A.N. 5266, 5266, 5269 (hereinafter "Senate Report") (stating that the 1986 Amendments were intended "to make the statute a more useful tool against fraud in modern times" and calling the FCA a "powerful tool in deterring fraud."); see also United States v. Mackby, *1019 243 F.3d 1159 (9th Cir.2001) ("We conclude the civil sanctions provided by the False Claims Act ... represent a payment to the government, at least in part, as punishment."). From the perspective of the perpetrator, moreover, it is easy to see why treble damages and mandatory penalties of up to $10,000 per false claim would seem intended to punish and deter. But there is nothing unusual about this. "Although punishment, in a certain and very limited sense, may be the result of the statute before us so far as the wrongdoer is concerned, yet we think it clear such is not its chief purpose[.]" Brady v. Daly, 175 U.S. 148, 157, 20 S.Ct. 62, 44 L.Ed. 109 (1899) (cited in United States ex rel. Marcus v. Hess, 317 U.S. 537, 551, 63 S.Ct. 379, 87 L.Ed. 443 (1943)). As the Supreme Court has recognized more recently, "all civil penalties have some deterrent effect." Hudson v. United States, 522 U.S. 93, 102, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997) (citing Department of Revenue of Montana v. Kurth Ranch, 511 U.S. 767, 777, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994); United States v. Ursery, 518 U.S. 267, 284-285, n. 2, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996)). Thus the mere fact that the FCA's damages are punitive and deterrent in the eyes of the wrongdoer does not necessarily detract from Congress's predominantly compensatory aim. In providing for treble damages and mandatory penalties under the FCA, Congress intended a complex mix of compensation, punishment, and deterrence.
Although they are indeed harsh, the FCA's damages provisions are largely compensatory in nature. Congress's preeminent concern in amending the FCA was protecting the federal fisc from fraud: "The purpose of [the False Claims Amendment Act of 1986] is to enhance the government's ability to recover losses sustained as a result of fraud against the government." Senate Report at 5266; see also id. at 5271 (describing the FCA as "a civil remedy designed to make the government whole for fraud losses"). The Department of Justice has estimated fraud as draining 1 to 10 percent of the entire federal budget. See id. at 5268. The FCA is one effective means the government uses to recoup some of this loss.
The harm suffered by the government cannot be viewed narrowly as the monetary loss occasioned solely by a detected false claim. As Genty and Bornstein realized, the government must foot the bill for "the costs, delays, and inconveniences occasioned by fraudulent claims." Genty, 937 F.2d at 912 fn. 7 (citing Bornstein, 423 U.S. at 314, 96 S.Ct. 523). In addition, the harm of detected fraud is probably minuscule in relation to fraud that goes undetected:
Through hearings and research on government fraud, the Committee has sought and is continuing to seek out the reasons why fraud in government programs is so pervasive yet seldom detected and rarely prosecuted. It appears there are serious roadblocks to obtaining information as well as weaknesses in both investigative and litigative tools. In an effort to correct some of those weaknesses, the Committee has reviewed the government's remedies against false claims and developed the legislative improvements embodied in [the False Claims Amendments Act].
Senate Report at 5269. Nor is the government's harm easily measurable in dollars. As the Senate Report notes, "fraud erodes public confidence in the government's ability to efficiently and effectively manage its programs." Id. at 5268. Although a multiplier may offer only "rough remedial justice," United States v. Halper, 490 U.S. 435, 446, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989), it does help to account for these additional costs that remain as stubbornly difficult to quantify in 1986 as they were in *1020 1863. See Marcus, 317 U.S. at 552, 63 S.Ct. 379 ("The inherent difficulty of choosing a proper specific sum which would give full restitution was a problem for Congress.").
With the 1986 amendments, the government also now bears an even greater expense in detecting, investigating, monitoring, and in many cases prosecuting fraud. The civil investigative provisions of the FCA were added to broaden the government's efforts in this respect in 1986. See 31 U.S.C. § 3732. The Congressional Budget Office, analyzing the potential economic impact of the 1986 amendments on the Department of Justice, observed: "Increased costs for litigation would offset some of the increased revenues produced by this bill, if it results in an increased number of false claims actions, particularly those brought by individuals." See Senate Report at 5302 (statement of Rudolph G. Penner, Director of the Congressional Budget Office). Hence Congress apparently regarded the enhanced damages under the amendments as producing revenue to cover the increased costs of litigating FCA claims. There is nothing improper about Congress shifting the cost of battling fraud from the taxpayers to those who are found liable for defrauding the government.
Further, the government is not the only party who must be compensated by a qui tam award. The efficacy of the statutory framework depends upon so-called "whistleblowers" coming forward to reveal false claims:
Detecting fraud is usually very difficult without the cooperation of individuals who are either close observers or otherwise involved in the fraudulent activity. Yet in the area of government fraud, there appears to be a great unwillingness to expose illegalities.
Senate Report at 5269. Concerned about the lack of incentives for whistleblowers to come forward, Congress enacted the Amendments, in part, to encourage them:
The Committee believes changes are necessary to halt the so-called "conspiracy of silence" that has allowed fraud against the government to flourish. John Phillips, co-director of the Center for Law in the Public Interest, a nonprofit law firm specializing in assisting "whistleblowers", testified that more effective fraud detection will only occur if changes are made at the basic employee level. Phillips said people who are unwilling participants in fraudulent activity must be given an opportunity to speak up and take action without fear and with some assurance their disclosures will lead to results.
Id. at 5271.
As one case cited approvingly by both the Supreme Court and the Senate colorfully described the qui tam mechanism:
"The statute is a remedial one. It is intended to protect the treasury against the hungry and unscrupulous host that encompasses it on every side, and should be construed accordingly. It was passed upon the theory, based on experience as old as modern civilization, that one of the least expensive and most effective means of preventing frauds on the treasury is to make the perpetrators of them liable to actions by private persons acting, if you please, under the strong stimulus of personal ill will or the hope of gain. Prosecutions conducted by such means compare with the ordinary methods as the enterprising privater does to the slow-going public vessel."
United States ex rel. Marcus v. Hess, 317 U.S. 537, 542 fn. 5, 63 S.Ct. 379, 87 L.Ed. 443 (quoting from United States v. Griswold, 24 F. 361, 366 (D.Or.1885)); see also Senate Report at 5276.
The remedial function of the FCA depends directly on the "strong stimulus" *1021 applied to the "enterprising privater." This is the nature of a bounty-hunter statute. As the Supreme Court's historical review of such statutes in Vermont Agency powerfully attests (see 120 S.Ct. at 1863-65) there is nothing unusual about Congress dictating that losing defendants should bear the cost of paying whistleblowers to come forward to make the government whole. "We should, of course, fully sustain informers in proceedings where Congress has utilized their self-interest as an aid to law enforcement. Informers who disclose law violation even for the worst of motives play an important part in making many laws effective." United States ex rel. Marcus v. Hess, 317 U.S. 537, 558, 63 S.Ct. 379, 87 L.Ed. 443 (1943) (Jackson, J., dissenting).
The relator's recovery is more than just a bounty. It is also based on actual harm that is personal to the whistleblower and unrelated to the government's share of the damages:
We believe that a qui tam relator suffers substantial harm and the qui tam provisions of the FCA are intended to remedy that harm. First, a qui tam relator can suffer severe emotional strain due to the discovery of his unwilling involvement in fraudulent activity. Moreover, the actual or potential ramifications on a relator's employment can be substantial. As several courts have recognized, qui tam relators face the Hobson's choice of "keeping silent about the fraud, and suffering potential liability (and guilty consciences), or reporting the fraud and suffering repercussions, some as extreme as dismissal." United States ex rel. Robinson v. Northrop Corp., 824 F.Supp. 830, 835 (N.D.Ill. 1993); accord United States ex rel. Burch v. Piqua, 803 F.Supp. 115, 119 (S.D.Ohio 1992). Finally, the relator can suffer substantial financial burdens as a result of the time and expense involved in bringing a qui tam action.
United States ex rel. Neher v. NEC Corp., 11 F.3d 136, 138 (11th Cir.1993). The Senate Report cites testimony raising these and similar concerns. See Senate Report at 5270-72 (citing testimony of Robert Wityczak and John Gravitt) and 5293 (acknowledging the "risks and sacrifices of the private relator").
In sum, a balanced assessment of Congress's intent in passing the 1986 amendments leads to the conclusion that the FCA's ultimate purpose is to compensate the government and the qui tam relator. "The FCA has two primary purposes: `to alert the government as early as possible to fraud that is being committed against it and to encourage insiders to come forward with such information where they would otherwise have little incentive to do so.'" United States ex rel. Newsham v. Lockheed Missiles, 190 F.3d 963, 965-66 (9th Cir.1999) (quoting from Biddle, 161 F.3d at 538-39). Although there is undoubtedly a punitive and deterrent dimension, this does not detract from the clearly compensatory thrust of the statute.
This leads to the further question now before this court: How should the FCA's complex remedial scheme be interpreted in its application to a local governmental entity such as the SFHA? Given the text, structure and legislative history of the 1986 amendments there are at least three interpretations of Congressional intent possible. The court could find that: (1) Congress intended to exempt municipalities, sub silentio, by enhancing the damages to a point where they implicate the common-law immunity against punitive damages; (2) Congress intended the damages to apply to municipalities despite the fact that they are, at least in part, punitive in nature; or (3) Congress did not even address the issue because it did not regard *1022 the damages as "punitive damages" in the first instance.
This court concludes that the latter interpretation is the most plausible one. As discussed above, Congress intended the FCA to serve a predominantly remedial purpose. And the policies underlying the common-law immunity against punitive damages as articulated in Newport do not conflict with Congress's design in amending the FCA (discussed below). Although judge-made doctrine may generally frown upon imposing heavy damage awards on local governments, "[s]ound rules of statutory interpretation exist to discover and not to direct the Congressional will." United States ex rel. Marcus v. Hess, 317 U.S. 537, 542, 63 S.Ct. 379, 87 L.Ed. 443 (1943).
Furthermore, it is premature to decide whether an eventual award in this case, if any, will violate the presumptive commonlaw immunity. The Ninth Circuit has authorized reducing an FCA award if it runs afoul of the Excessive Fines Clause of the Eighth Amendment. See United States v. Mackby, 243 F.3d 1159 (9th Cir. Mar. 22, 2001). Therefore the court will address the possible excessiveness of any damages awarded once there is a concrete set of facts on which to base a decision.[11]

b. The FCA as Applied to the SFHA Does Not Violate the Policies Articulated in Newport.

When it limited "punitive damages" in City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), the Supreme Court did not include any damage measure that could be loosely characterized as "punitive in nature." On the contrary, Newport articulated policy concerns about a number of specific features of common-law punitive damages that distinguish them from the type of statutory damages available under the FCA.
First, the Newport Court emphasized repeatedly that when compensatory damages are already available against municipal entities, punitive damages would overcompensate prevailing plaintiffs at the expense of local taxpayers:
Punitive damages by definition are not intended to compensate the injured party, but rather to punish the tortfeasor whose wrongful action was intentional or malicious, and to deter him and others from similar extreme conduct. Regarding retribution, it remains true that an award of punitive damages against a municipality "punishes" only the taxpayers, who took no part in the commission *1023 of the tort. These damages are assessed over and above the amount necessary to compensate the injured party. Thus, there is no question here of equitably distributing the losses resulting from official misconduct. Indeed, punitive damages imposed on a municipality are in effect a windfall to a fully compensated plaintiff, and are likely accompanied by an increase in taxes or a reduction of public services for the citizens footing the bill. Neither reason nor justice suggests that such retribution should be visited upon the shoulders of blameless or unknowing taxpayers.
Id. at 266-67, 101 S.Ct. 2748 (emphases added).
The FCA, by contrast, does not provide for compensatory damages with punitive damages available if the tortfeasor's conduct is deemed to have been intentional or malicious. There is only one statutory award prescribed, and it does not distinguish between "compensatory" and "punitive" damages. See 31 U.S.C. § 3729(a) (any person committing the acts proscribed by the FCA with the appropriate scienter "is liable to the United States government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the government sustains because of the act of that person."). Treble damages can be reduced to double damages only if the defendant cooperates with the government in various ways before suit. See id. § 3729(a)(7)(A)-(C).
By precluding the statutorily prescribed damages entirely, the SFHA's interpretation of Newport would free the municipality from its proper obligation and radically undercompensate the government. See Newport, 453 U.S. at 263, 101 S.Ct. 2748 (noting that "[c]ompensation was an obligation properly shared by the municipality itself" at common law). It would also insulate local entities, to a degree, from the public opprobrium so central to the proper functioning of democratic institutions.
Immunizing municipal entities from an award under the FCA would also undercompensate relators. As discussed above, the "bounty-hunter" structure of the FCA depends on the existence of a "bounty" to draw knowledgeable relators forward. Without a bounty to compensate them for their participation, municipal employees aware of fraud will not have adequate incentives to report their employer's misconduct. In the case at bar, federal prosecutors have already secured felony convictions against Patricia Williams, Ena Coleman and Yolanda Jones based on plaintiffs' disclosures. An entire network of fraudulent claims and profiteering within the SFHA was brought to light. Without the FCA's whistleblower incentives, the fraud might well have continued undetected. In short, the SFHA's position would substantially undermine the government's partnership with municipal whistleblowers by reducing their compensation to a nullity.
Second, the Newport Court expressed concern that punitive damage awards would "burden the very taxpayers and citizens for whose benefit the wrongdoer was being chastised." Id. at 263, 101 S.Ct. 2748. However, when applied to a local entity that operates on federal grant money, the FCA will not burden "the very taxpayer" who is supposed to be protected. Instead, money granted to a local entity on fraudulent pretenses will be returned to the federal government and services can be provided to those who are truly eligible for them. See Cal. Health & Saf.Code §§ 34312.3(4), 34322.2. Local taxpayers will not bear the financial burden. For example, if the United States in the case at bar were to recover treble damages and penalties, these funds will not come out of the city's coffers. The SFHA is an independent *1024 local public corporation holding its own assets and generating its own revenues. See id. §§ 34212, 34248(b), 34312, 34327, 34315.3, 34350-34375. If the SFHA were unable to meet its obligations to the federal government, the United States could forgive the debt or HUD could reallocate the funds to the SFHA while imposing stringent conditions on their use. See, e.g., 42 U.S.C. § 1437f(z). Local citizens would be benefited, not burdened, if the rightful recipients of federal housing aid would receive the benefits they were intended to receive. Under the FCA the federal taxpayer is the one to be protected, not the local taxpayer. In other words, the federal taxpayer certainly has a legitimate complaint if the SFHA is obtaining federal housing funds through fraud without the truly needy seeing any improvement in their situation. Local citizens may not appreciate this concentration of national ire, but their dissatisfaction would be a reason for change in the SFHA's leadership, not a reason to fault the FCA. See id. §§ 34246, 34270.1, 34282. In short, an award of treble damages and penalties under the FCA in favor of the United States, the grantor of the funds in the first place, would not be "punishing innocent taxpayers and bankrupting local governments." Newport, 453 U.S. at 266, 101 S.Ct. 2748.
Third, punitive damage awards under the common law are based on a jury's assessment of what it will take to "punish" the culprit financially and thereby deter him from recidivism:
The Court has remarked elsewhere on the broad discretion traditionally accorded to juries in assessing the amount of punitive damages. Because evidence of a tortfeasor's wealth is traditionally admissible as a measure of the amount of punitive damages that should be awarded, the unlimited taxing power of a municipality may have a prejudicial impact on the jury, in effect encouraging it to impose a sizable award. The impact of such a windfall recovery is likely to be both unpredictable and, at times, substantial, and we are sensitive to the possible strain on local treasuries and therefore on services available to the public at large.
Id. at 270-71, 101 S.Ct. 2748 (citations and footnotes omitted). However, the wealth of the defendant is not a factor to be taken into account by a jury under the FCA. Instead, penalties with fixed ranges and multipliers keyed to actual harm are mandated. See 31 U.S.C. 3729(a) (providing for civil penalties plus "3 times the amount of damages which the government sustains because of the act.") (emphasis added). Thus "the broad discretion traditionally accorded to juries in assessing the amount of punitive damages" is not at work under the FCA. The only discretion in an FCA award is in the hands of the judge who fixes the civil penalties within the $5,000-10,000 range. As it stands, the wealth of the SFHA will have no bearing on the calculation of damages should liability be established. Moreover, the size of any eventual award will be limited by the Excessive Fines Clause of the Eighth Amendment. See United States v. Mackby, 243 F.3d 1159 (9th Cir. Mar. 22, 2001).
In sum, Congress's intent in increasing the FCA's damage provisions does not run afoul of the presumptive common-law immunity addressed in the Newport decision. Because the court concludes that the FCA was intended to fulfill primarily remedial ends and does not run afoul of Newport, the court rejects the SFHA's contention that it is immune from FCA damages.

IV.

RETALIATION FOR WHISTLEBLOWING
In their third claim for relief, plaintiffs allege that defendants Nelson, Davis and *1025 the SFHA retaliated against them for complaining to their superiors at the SFHA and to San Francisco public officials about the agency's improprieties. See Complaint at ¶¶ 54-56, 74-81. Plaintiffs maintain that they suffered "humiliation, embarrassment, mental anguish, and emotional distress including, but not limited to, loss of sleep, shock and injury to their nervous systems" as a result of this retaliation. Id. at ¶ 80. Plaintiff Rosales further alleges that she was "forced to suspend her duties due to the stress occasioned upon her by defendants' conduct with a medical recommendation not to return to work." Id. In a subsequent submission to the court, Rosales indicates that her employment at the SFHA has been terminated. See Pl. Notice (filed June 7, 2000) at 2:4-6. Plaintiffs ask for general and punitive damages. See Complaint at 16.
The anti-retaliation provision of the FCA, codified as 31 U.S.C. § 3730(h), provides in relevant part:
Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.
31 U.S.C. § 3730(h).
There are three elements to a retaliation claim under § 3730(h): (1) the employee must have been engaging in conduct protected under the FCA; (2) the employer must have known that the employee was engaging in such conduct; and (3) the employer must have discriminated against the employee because of her protected conduct. See United States ex rel. Hopper v. Anton, 91 F.3d 1261, 1269 (9th Cir.1996), cert. denied, 519 U.S. 1115, 117 S.Ct. 958, 136 L.Ed.2d 844 (1997). Hopper defines "conduct protected under the FCA" as "investigating matters which are calculated, or reasonably could lead, to a viable FCA action." Id. (citing Neal v. Honeywell Inc., 33 F.3d 860, 864 (7th Cir. 1994) and Robertson v. Bell Helicopter Textron, Inc., 32 F.3d 948, 950-52 (5th Cir.1994), cert. denied, 513 U.S. 1154, 115 S.Ct. 1110, 130 L.Ed.2d 1075 (1995)).
Defendants argue that plaintiffs offer no evidence that: (1) defendants retaliated against plaintiffs because of protected activity; (2) defendants knew of plaintiffs' actions in furtherance of the present lawsuit at any time relevant to the claim; or (3) defendants took any adverse employment action against plaintiffs in retaliation for protected activity. See Motion at 24-25.[12]
Plaintiffs mistake their burden in this summary judgment motion. They state: "Defendants cite no evidence of their claim that Plaintiffs cannot point to specific acts taken against them in retaliation." Opposition at 16:18-20. But defendants' obligation in a motion for summary judgment is simply to point to a lack of evidence in the record; since plaintiffs bear the burden of proof on the issue at trial, it is up to them to come forward with specific evidence substantiating their claim. See Celotex Corp. v. Catrett, 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
The legislative history to the False Claims Amendments Act of 1986 confirms *1026 this result. It suggests that retaliation plaintiffs must establish a two-pronged prima facie showing before the burden shifts to the defendant:
One, the whistleblower must show the employer had knowledge the employee engaged in "protected activity" and, two, the retaliation was motivated, at least in part, by the employee's engaging in protected activity. Once these elements have been satisfied, the burden of proof shifts to the employer to prove affirmatively that the same decision would have been made even if the employee had not engaged in protected activity.
Senate Report at 5300. The Senate Report clarified that "protected activity" does not have to lead to a proven FCA violation; rather "the actions of the employee must result from a `good faith' belief that violations exist." Id.
The only evidence cited by plaintiffs in support of their retaliation claims are their own interrogatory responses stating that they "believe" the SFHA's actions were retaliatory in intent. See Opposition at 16:21-25. This does not suffice to establish a genuine issue of material fact. As Hopper indicates, plaintiffs alleging retaliation must establish, at a minimum, that defendants knew of their investigative activities. See 91 F.3d at 1269 ("Unless the employer is aware that the employee is investigating fraud, the employer could not possess the retaliatory intent necessary to establish a violation of § 3730(h).") No reasonable jury could conclude, based on the scant evidence cited here, that defendants knew of plaintiffs' activities, let alone that they retaliated based on such activities. Accordingly, summary judgment is GRANTED in favor of defendants on plaintiffs' third claim for relief.

CONCLUSION
For the foregoing reasons, the court hereby:
GRANTS summary judgment in favor of the City and County of San Francisco and defendant Albert Nelson on plaintiffs' first claim for relief. Since the city is named as a defendant only in the first claim for relief, it is dismissed from the case;
GRANTS summary judgment in favor of the remaining moving defendants on plaintiffs' first claim for relief insofar as the claim relates to HOPE VI grant, COMP grant, YAP and ADPCT funds. However, the court DENIES defendants' motion for summary judgment on the first claim for relief insofar as it relates to Section 8 improprieties;
GRANTS summary judgment in favor of the moving defendants on plaintiffs' third claim for relief.
This leaves for trial: (1) the first claim for relief insofar as the claim relates to Section 8 certificates; and (2) the second claim for relief. The status of defendant Ronnie Davis also needs to be determined. The parties are to appear for a status conference on April 27, 2001 to discuss further proceedings in this matter.
IT IS SO ORDERED.
NOTES
[1] Individual defendants Nelson and Gilmore were both employees of the SFHA during the relevant time frame. The complaint also names Ronnie Davis, a current SFHA employee, as a defendant. The moving papers do not indicate whether Mr. Davis is party to the motion. The court will therefore delay ruling on the motions as to Mr. Davis until the parties clarify his status in this litigation at the next status conference.
[2] Aflatooni cites to the earlier version of Biddle found at 147 F.3d 821. This version was superseded by a later opinion reported at 161 F.3d 533. This later opinion differs in only one respect: a dissent from Judge Kleinfeld has been added. Further citations to Biddle will be modified in brackets to refer to the later opinion.
[3] Defendants object to the Bains deposition and other submissions on several evidentiary grounds. See Def. Objections to Pl. Evidence (filed Nov. 5, 1989). Since the court concludes that it lacks subject matter jurisdiction over the HOPE VI and COMP claims, it is unnecessary to address these objections here.
[4] Plaintiff Rosales made some seemingly relevant statements concerning the MOU, but plaintiffs do not cite to this evidence in their opposing brief. See Jones Decl., Exh. H, Rosales Statement at U00003. In any event, Rosales' statement does not recite any facts regarding the SFHA's alleged unkept promise to revise the MOU to bring it into compliance with HUD regulations. Since the unkept promise is the only allegation distinguishing plaintiffs' claim from the prior lawsuit, the absence of evidence on point weighs against jurisdiction. The court also notes that an unkept promise, on its own, probably does not rise to the level of a false claim for purposes of the FCA but rather presents what appears to be a contractual issue. See United States ex rel. Butler v. Hughes Helicopters, Inc., 71 F.3d 321, 326 (9th Cir.1995).
[5] The Nguyen litigation involved allegations that the SFHA was failing to provide safe and affordable housing to Asian residents. As part of the class settlement, the court approved policies designed to allow people, in a limited number of situations, to seek priority transfers. The applicable situations included life-threatening circumstances, uninhabitable units, medical hardships, and the like. See Def. Req. for Jud. Not., Exh. B. Among the options available for people in these emergency situations, the court approved issuance of Section 8 certificates if consistent with HUD regulations. See id. at ¶ A.3.a.
[6] The court notes that Bly-Magee's holding (no monetary injury to the federal fisc required under the FCA) is at some tension with prior statements by the Ninth Circuit regarding a qui tam relator's Article III standing to sue under the statute. See, e.g., United States ex rel. Kelly v. Boeing Co., 9 F.3d 743, 748 (9th Cir.1993) (holding that "the FCA effectively assigns the government's claims to qui tam plaintiffs such as Kelly, who then may sue based upon an injury to the federal treasury.") (emphasis added). Because this court concludes below that the false claims in this case, if established, do involve monetary injury to the federal treasury, there is no need to address this possible anomaly in the law of the Ninth Circuit.
[7] This court previously granted the State of California's motion to dismiss, holding that the SFHA is not an agent of the State of California such that California could be liable for the SFHA's alleged violations of the FCA. The court relied, in large measure, on Lynch v. San Francisco Housing Authority, 55 Cal. App.4th 527, 65 Cal.Rptr.2d 620 (1997) (holding that the SFHA is not an arm of the state for purposes of Eleventh Amendment immunity against suit under 42 U.S.C. § 1983) and Tyhurst v. Housing Authority of Los Angeles County, 213 Cal.App.2d 715, 29 Cal.Rptr. 239 (1963) (concluding that the Los Angeles County Housing Authority is a "local public entity" for purposes of tort liability). The SFHA does not now seek, and the court declines, to revisit this issue. This order accordingly assumes that the SFHA is not a state agency, but rather is a local public entity as that term is understood by the courts of California.
[8] The Second Circuit followed the Eighth Circuit in holding that states and state agencies are "persons" under the FCA. See United States ex rel. Zissler v. Regents of the University of Minnesota, 154 F.3d 870, 874-75 (8th Cir. 1998).
[9] Defendants have submitted several unpublished district court decisions for consideration. The court declines to discuss these opinions or lend them any weight given this circuit frowns upon citation to unpublished materials. See Ninth Circuit Rule 36-3.
[10] P.L. No. 99-562, 100 Stat. 3153 (1986).
[11] Dunleavy asserts that it is "clearly beyond [the court's] power" to award some lesser form of damages, via remittitur or some other mechanism, when the FCA is quite specific about the damages mandated for violations of its terms. See 2000 WL 1522854 at *8; accord Chandler II, 118 F.Supp.2d 902, 903 (N.D.Ill.2000). The FCA mandates an award of treble damages and penalties of $5,000-10,000 per violation. See 31 U.S.C. § 3729(a). The treble damages award can be reduced to double damages in certain specific situations not present here. See id. § 3729(a)(7)(A)-(C). It is worth noting, however, that other courts have taken precisely the course that Dunleavy eschews as ultra vires. See United States ex rel. Garibaldi v. Orleans Parish School Board, 46 F.Supp.2d 546, 564-65 (E.D.La.1999) (reducing $7,850,000 civil penalty award to $100,000 to prevent it from being "excessive and out of proportion" to the loss suffered). Compare Peterson v. Weinberger, 508 F.2d 45, 55 (5th Cir.1975), cert. denied sub nom. Peterson v. Mathews, 423 U.S. 830, 96 S.Ct. 50, 46 L.Ed.2d 47 (1975)(allowing reduction of civil penalty to reflect a "fair ratio to damages to insure that the government completely recoups its losses") with United States v. Hughes, 585 F.2d 284, 286 (7th Cir.1978) (FCA's damages provision "leaves the trial court without discretion to alter the statutory amount") and United States v. Killough, 848 F.2d 1523, 1532-34 (11th Cir.1988) (applying the pre-1986 statutory limits).
[12] Defendants also move to strike plaintiffs' prayer for punitive and general damages because § 3730(h) provides only for "make whole" relief. See id. at 25. Since plaintiffs' second claim for relief under 42 U.S.C. § 1983 is not presently before the court, it would be premature to address the issue now.